ROBERT D. STEPHENS, APPELLEE AND CROSS-APPELLANT, v. CELERYVALE TRANSPORT, INC., APPELLANT AND CROSS-APPELLEE.

286 N. W. 2d 420

Filed December 11, 1979. No. 42463.

Baylor, Evnen, Baylor, Curtiss & Grimit, for appellant.

William A. Wieland of Healey, Brown, Wieland & Kluender, for appellee.

Heard before BOSLAUGH, McCOWN, CLINTON, and BRODKEY, JJ., and ENDACOTT, District Judge.

CLINTON, J.

This is an appeal by the defendant, Celeryvale Transport, Inc., from the Nebraska Workmen's Compensation Court on rehearing, from an order by a divided court awarding the plaintiff, Robert D. Stephens, compensation for injuries received while allegedly in the employment of Celeryvale. The issue which is determinative of the outcome of this appeal is whether the finding of the Workmen's Compensation Court that Stephens was an employee of Celeryvale, rather than an independent contractor, is clearly wrong. We determine, as a matter of law, that Stephens was an independent contractor and reverse the judgment of the Workmen's Compensation Court and direct dismissal.

The standard of review governing factual determinations of the Workmen's Compensation Court is governed by the relevant portion of section 48-185, R. R. S. 1943, which provides: "The findings of fact made by the Nebraska Workmen's Compensation Court after rehearing shall have the same force and effect as a jury verdict in a civil case." That statute also limits the grounds for reversal to four, which include: "(3) there is not sufficient evidence in the record to warrant the making of the order, judgment, or award . . . ." In applying this statute we have held the findings of fact made by the Workmen's Compensation Court on rehearing will not be set aside on appeal unless clearly wrong. Hyatt v. Kay Windsor, Inc., 198 Neb. 580, 254 N. W. 2d 92. However, final determination of issues of law are for this court. Where the inference is clear that there is, or is not, a master and servant relationship, the determination is for the court and not for the trier of

fact. Peetz v. Masek Auto Supply Co., 161 Neb. 588, 74 N. W. 2d 474; Mansfield v. Andrew Murphy & Son, 139 Neb. 793, 298 N. W. 749; Vontress v. Ready Mixed Concrete Co., 170 Neb. 789, 104 N. W. 2d 331.

The evidence shows that at the times pertinent to this litigation Celeryvale was an interstate motor freight carrier holding an I. C. C. certificate and appropriate certificates from various state commissions. It also shows that Stephens was the owner of a certain 1968 Kenworth tractor. For a number of years Stephens has made his living by operating his own truck, which he leased to others who held the appropriate operating certificates.

On May 12, 1977, Stephens entered into an "Equipment Lease and Transportation Agreement" with Celeryvale, in which the latter is described as "carrier" and Stephens as "contractor." By the terms of the agreement, Stephens leased to Celeryvale the above-mentioned tractor for a period of 1 year. The lease provided that the carrier pay contractor 42 cents a loaded mile. Although the agreement does not expressly so provide, it is clear from the evidence the tractor was to be used to pull trailers either owned by carrier or which it leased from others. The contractor agreed to bear "all costs of licenses, proration expenses, fuel and use taxes, gross receipts tax, Colo. G.T.M. tax, intangeable [sic] tax, tolls, and other fees or assessments incident to the ownership and operation of said tractor." Carrier was obligated to pay for the operating permits for the Kenworth and public liability insurance thereon, except bobtail, as well as for all licenses, proration expenses, and maintenance on carrier-owned trailers.

Again, although not expressly provided in the agreement, it is to be clearly inferred from the way in which the parties operated that the agreement contemplated that Stephens would either operate the tractor himself or furnish drivers. It provided:

"All drivers, laborers and other helpers utilized by the Contractor shall be exclusively the employees of and compensated by the Contractor." It provided: "Carrier will bear the cost of Workmens Compensation Insurance for the Contractor," and, "It is expressly understood and agreed that all employees are subject to certain rules and regulations of said Carrier."

Sometime after the written agreement was entered into, Stephens was furnished with a copy of "current procedures and regulations affecting all owner-operators, and owner-operator drivers." The procedures and regulations referred to related to telephone reports and the weighing of vehicles. It contained a prohibition of the presence of alcoholic beverages in the vehicle, made drivers responsible for damage to equipment and cargo, and required them to pay fines for speeding or other moving violations. Also covered were paperwork, bills of lading, filing of logs, the making of cash advances by the contractor, physical examinations, shortages, and certain other responsibilities of drivers.

Both the contract and the regulations required the contractor to make a cash "bond" deposit of $1,000 to guarantee performance of the contract. This was to be paid in installments at a stated rate per trip. The agreement provided that the contractor could cancel the lease on 30 days notice. It further provided: "The parties intend to create by this contract the relationship of CARRIER and INDEPENDENT CONTRACTOR, and not an employer-employee relationship. Neither the CONTRACTOR nor its employees are to be considered the employees of the CARRIER at any time, under any circumstances, for any purpose."

The evidence shows the parties operated in the following manner. Celeryvale solicited shippers, advised Stephens where and when to pick up cargo, and the cargo's destination. The bills of lading re-

ceived from the shipper specified destinations and usually delivery dates.

Celeryvale made advances to Stephens for each trip. The agreement and regulations both indicated payment would be made for each trip after completion of the necessary paperwork. In actual practice, only advances were made and no payment of any balance was made until after the accident in which Stephens was injured. That accident occurred on August 3, 1977, after the agreement had been in effect less than 3 months. During that time Stephens made 21 hauls for Celeryvale.

The evidence shows that neither income tax nor social security tax was withheld from the payments made to Stephens. Whether Celeryvale paid an employer's share of social security on compensation to Stephens is not shown, but it is inferable that it did not, since Stephens' profit or net compensation could be determined only after his business expenses were deducted. The record does not show whether Stephens paid social security as a self-employed person.

The evidence does not leave doubt that Stephens regarded himself as self-employed even though his testimony at the original hearing and at the rehearing was somewhat contradictory on the point. At the rehearing, the testimony on the point, including admissions as to testimony at the original hearing, was as follows: "Q. Mr. Stephens, have you always owned your own unit and worked for yourself, so to speak?

A. Yes.

Q. You've always considered yourself your own boss; right?

A. Not always. I used to work for other people.

Q. While you owned your own tractors?

A. I always leased them to somebody else.

Q. But always considered yourself your own boss?

A. When I was gypsying I did, but when you lease

to somebody, you kind of go by their own agreement.
Q. I am going to call your attention again back to the first hearing. Mr. Stephens, the Court was asking you a little bit about the amount of money you were receiving.

'Q. And you say one of the reasons you didn't have a feel for other truck drivers is that you run your own rig, worked for yourself most of your life; is that correct?
'A. Yes.'

Do you remember that?
A. I guess.
Q. That answer was correct, wasn't it?
A. Yes. . . .
Q. . . . My next question:

'Q. So you've sort of been your own boss?
'A. Yes.'

That was correct, was it not?
A. Whenever it was leased. I was gypsying for a long time.''

The evidence indicates Stephens generally selected his own route of travel, although he knew if a trailer owned or leased by Celeryvale required repairs or tires he might have to go to certain places to get these repairs or replacements. Stephens made telephone reports as required by the regulations. He kept and transmitted mileage logs as required. He testified, however, that Celeryvale calculated the mileage by the map for purposes of compensation. He observed driving hours as required by I. C. C. regulations. His hours of departure and driving time were largely determined by the necessities imposed by scheduled delivery times.

Stephens paid his own truck expenses except as we have otherwise indicated. He could satisfy the contract by furnishing a driver other than himself and could take time off when he wanted. It is not made plain by the evidence whether or not he could refuse hauls which were offered. There is no

evidence that he did.

At the time of the occurrence of the accident, Stephens had just picked up a load of pork at Crete, Nebraska, for delivery in New Orleans. He did not plan to make that trip himself, since he wanted to take some time off to work on the Kenworth tractor. He had, therefore, arranged for another driver. The Kenworth was not to be used for the trip to New Orleans because it would exceed the legal length limits in some states when coupled to that particular trailer. He had arranged for the use of a cab-over tractor of which he had possession and control. At the time of the accident, he was driving the Kenworth and pulling the loaded trailer en route to Shoemaker's truck stop at Lincoln. He was being followed in the cab-over tractor by the driver who would make the trip to New Orleans. Some small repairs were to be made to the cab-over tractor at Shoemaker's to prepare it for the trip. That tractor would then be attached to the trailer in place of the Kenworth.

Because the cab-over tractor was not covered by the lease of May 12, 1977, a "trip lease" with Celeryvale was to be picked up at Shoemaker's. This had been previously arranged with Celeryvale. The agreement of May 12, 1977, contemplated "trip leases" (apparently special leases covering one trip only with equipment other than that described in the lease). The pertinent provision was: "Carrier will guarantee $.42 a mile for trip lease for all equipment."

Stephens testified that for the proposed New Orleans trip the driver would be paid separately by Celeryvale and that Stephens was to receive the mileage payment less the driver's pay. He also testified he had been promised $100 by Celeryvale for finding the driver, but he had never received that payment.

The relationship of employer and employee, as

well as that of employer and independent contractor, arises from the contract between the parties. Meyer v. State Farm Mut. Auto. Ins. Co., 192 Neb. 831, 224 N. W. 2d 770; Schneider v. Village of Shickley, 156 Neb. 683, 57 N. W. 2d 527. Whether the ultimate issue is workmen's compensation coverage, liability for acts of a servant, or some other matter, the question is, what was the real agreement between the parties? The answer to the contract question is not at all dependent upon the ultimate issue, i.e., the criteria to be applied in determining the nature of the contract is the same whether it involves workmen's compensation coverage or something else. See, Peetz v. Masek Auto Supply Co., 161 Neb. 588, 74 N. W. 2d 474; Mansfield v. Andrew Murphy & Son, 139 Neb. 793, 298 N. W. 749; In re Estate of Bingaman, 155 Neb. 24, 50 N. W. 2d 523; Heilner v. Workmen's Compensation Appeal Bd., 393 A. 2d 1085 (Pa. Commw. Ct., 1978).

We have held there is no single test by which the determination of whether or not a workman is an employee, as distinguished from an independent contractor, may be made. This must be determined from all the facts in the case. Voycheske v. Osborn, 196 Neb. 510, 244 N. W. 2d 74. The burden of proof is upon the employee to prove the nature of the relationship. Voycheske v. Osborn, *supra.*

If there exists a written contract, it must, of course, be considered and may be of prime importance. Bohy v. Pfister Hybrid Co., 179 Neb. 337, 138 N. W. 2d 23; Tretter v. Dart Transit Co., 271 Minn. 131, 135 N. W. 2d 484; Bartle v. Travelers Ins. Co., 171 F. 2d 469 (5th Cir., 1948). However, a writing which merely denominates the relationship may not be used to conceal the true arrangement. Bohy v. Pfister Hybrid Co., *supra;* Tretter v. Dart Transit Co., *supra.* Most workmen's compensation cases do not involve written agreements which define the relationship. Bohy v. Pfister Hybrid Co., *supra,* is the

only such Nebraska case which our research has disclosed.

An independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the methods or means used. Such a person is not an employee within the meaning of the workmen's compensation statutes. Schneider v. Village of Shickley, *supra*.

Most of the pertinent criteria are enumerated in Voycheske v. Osborn, *supra*. Authority to direct, control, and supervise details of the work is indicative of an employer-employee relationship and in many cases this may be the most important criterium. However, even the employer of an independent contractor may, without changing the status, exercise such control as is necessary to assure performance of the contract in accordance with its terms. The right of the parties to terminate the relationship at will without any consequent liability may be indicative of employer-employee status. An independent contractor usually furnishes equipment to perform the service. The fact that the worker may substitute the services of another for his own is indicative of the status of independent contractor. The deduction of social security taxes and the withholding of income tax tends to indicate an employer-employee relationship, while the failure to do so is a contrary indication. The method of paying compensation is to be considered. If its profitability depends upon the worker's own capital investment, management, and the difference between income and expense, that is an indication of independent contractor status.

In this case, the written contract not only denominated the relationship as carrier and independent contractor, the specific terms of the agreement describe that kind of relationship. The manner in

which the agreement was carried out was not in any way inconsistent with Stephens' status as an independent contractor under the terms of the writing.

In Bohy v. Pfister Hybrid Co., *supra,* there existed a detailed contract, called a "Dealer's Agreement," pertaining to the sale by plaintiff of seed corn for defendant. The question was whether the plaintiff was an employee or an independent contractor. The written contract contained a provision as follows: " 'NEITHER said dealer nor any of his agents or employees shall in any manner be deemed or held to be employees of the Pfister Hybrid Company, nor shall said dealer or any agent or employee of his be entitled to any benefits payable to employees of the Pfister Hybrid Company, such as, but not limited to, workmen's compensation, pension, unemployment insurance and social security laws of the United States or the several States thereof.' " The record in that case showed the parties performed in accordance with the terms of the contract with only slight deviations in that the plaintiff sold corn for others as well as the defendant and "did not transmit proceeds . . . weekly or in the same form as received," as was required by the contract. This court said: "In this case all of the facts and circumstances, including the contract under which the service was performed and the performance thereunder, establish that the relationship between Bohy and the defendant was that of independent contractor."

We are, of course, aware that as of the time of the decision in Bohy v. Pfister Hybrid Co., *supra*, review by this court was de novo. However, it appears from the language used the court was saying that, under the undisputed facts, the relationship there was, as a matter of law, that of independent contractor. Similar situations and similar results were involved in Tretter v. Dart Transit Co., *supra*, and Bartle v. Travelers Ins. Co., *supra*. In the latter case the court held that where the claimant ex-

pressly convenanted that he was an independent contractor and not an employee and there were no vitiating factors, the claimant and those claiming under him were bound by the contract.

Let us now examine the evidence in the light of the criteria relevant in this case. Stephens, under the contract, furnished a truck and paid the expenses in connection therewith, save liability insurance while "bobtailing," a term for driving the tractor without a trailer. He had to procure his own liability insurance while "bobtailing" as well as his own collision coverage at all times if he desired such coverages. He was paid for his equipment and services by the loaded mile only. He received no compensation while moving from the place where one load was delivered to the place where another load was picked up. The record contains the clear inference that a great deal of such travel was involved. The contract provided no compensation for this travel and Stephens received none. Nonetheless, these moves were required in the interest of Celeryvale as well as Stephens.

Normally an employee is compensated while he works. An independent contractor's compensation, on the other hand, usually depends upon whether he makes a profit from the contract. Stephens was clearly operating to turn a profit and not for a mere wage. It is clear from his own statements previously mentioned that he considered he was working for himself.

The regulations enforced, or which could be enforced by Celeryvale under the agreement, appear to have been of two general types. First are those necessary to comply with I.C.C. regulations. Such compliance would be required whether or not Stephens' status was employee or independent contractor. The second type were those regulations which assured performance of the contract in accordance with its implied terms, viz., prompt pickups from

shippers and on-time delivery to receivers. Celery-vale exercised no control over the actual operation of the truck, nor precise routes to be traveled. In fact, at the time the accident occurred, Stephens was clearly operating on a route selected by him.

In this case, compensation was paid in a form consistent with that of independent contractor status, and there was no withholding of taxes or social security as would be required by law in the case of an employee.

It is clear Stephens could satisfy the contract by substituting the services of another for his own and that he was, in fact, engaged in so doing when the accident occurred. It is clear from the terms of the contract the provision pertaining to workmen's compensation insurance required Celeryvale to pay the premium on compensation insurance which Stephens would be required to have for his employees and that the premium was an item for which Stephens was to be reimbursed.

We hold that where, as here, a written contract exists which not only denominates the relationship as that of independent contractor but also describes that type of relationship, and nothing in the manner of performance by the parties is inconsistent with the relationship described, then the independent contractor is, as a matter of law, bound by the contract and is not to be deemed an employee within the meaning of the workmen's compensation statutes.

REVERSED AND DISMISSED.