GERALD T. SULLIVAN, APPELLEE, V.
GEO. A. HORMEL AND COMPANY,
A DELAWARE CORPORATION, AND
LUEDER CONSTRUCTION COMPANY,
A DELAWARE CORPORATION, APPELLANTS.

303 N.W.2d 476

Filed March 13, 1981. No. 43158.

John A. Rickerson of Rickerson & Welch for appellant Lueder.

Sam R. Brower of Swarr, May, Smith & Andersen for appellant Hormel and Co.

Warren C. Schrempp and John H. Hanley for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

This appeal arises from an action in the District Court for Douglas County by Gerald T. Sullivan, plaintiff (hereinafter Sullivan), against Geo. A. Hormel and Company, a corporation (hereafter Hormel or owner), and Lueder Construction Company, a corporation (hereafter Lueder or general contractor), for damages from personal injuries alleged to have been caused by the negligence of the two defendants and which occurred upon the premises where Hormel

was constructing an addition to the Hormel plant. At the close of all the evidence, the court denied the separate motions of Hormel and Lueder for a directed verdict, granted the motion of Sullivan for a directed verdict against both defendants on the issue of liability, and submitted to the jury only the issues of whether the negligence was the proximate cause of the injury and, if so, the amount of damages. The jury returned a verdict for Sullivan against both the owner and the general contractor.

On December 14, 1972, Sullivan was employed as a millwright by Citrus Machinery Company, Inc., which, on that date, was installing a conveyor system in the addition upon which the general contractor was still working. As Sullivan was leaving the building that day, at about 4:20 p.m., his right foot slipped on icy steps, striking the next step with some force and bruising the heel of that foot. This bruise is alleged to have lighted up a latent case of Buerger's disease which later resulted in the amputation of Sullivan's right leg below the knee.

The petition alleged the sole and proximate cause of Sullivan's "fall" was the negligence of the defendant Lueder in one or more of the following particulars:

"A) In failing to keep said construction site premises in a safe manner for workers at said site.

"B) In failing to instruct its employees to keep the steps upon which plaintiff fell, free from debris and ice so as to avoid injuries to workers at said site.

"C) In failing to clear and clean debris and ice from the steps on which plaintiff fell when it knew or should have known that the ice and debris on said steps posed a hazard for workers at said site.

"D) In allowing workers at said site only one means of ingress and egress to and from said plant before and after working hours."

It further alleged the negligence of Lueder was imputable to Hormel under the doctrine of respondeat superior.

Both Hormel and Lueder have appealed and made various assignments of error. As to Hormel, we need take note of only one, namely, it is asserted that the record, as a matter of law, establishes that the relationship of Hormel and Lueder was that of owner and independent contractor and Hormel was not liable under the doctrine of respondeat superior. As to Lueder, we must take note of the following assignments: The court erred in ruling that Lueder was negligent as a matter of law and in not submitting to the jury the issue of Sullivan's contributory negligence.

As to Hormel, we reverse and direct dismissal. As to Lueder, we reverse and remand for a new trial.

With certain exceptions, which it is not necessary to notice here, the employer of an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or his servants. *Merten v. Pedersen*, 199 Neb. 34, 255 N.W.2d 869 (1977); Restatement (Second) of Torts § 409 (1965). The term "independent contractor" includes building contractors erecting a building for a fixed sum according to specifications and not subject to the owner's control over the method of accomplishment. *Hand v. Rorick Constr. Co.*, 190 Neb. 191, 206 N.W.2d 835 (1973); *Simon v. Omaha P. P. Dist.*, 189 Neb. 183, 202 N.W.2d 157 (1972); Restatement (Second) of Agency, Introductory Note § 218 at 480-81 (1958). An employer of an independent contractor may, without changing the status of the parties, exercise such control as is necessary to assure performance of the contract in accordance with its terms. *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979). A general contractor, in control of the premises where work performance under a contract with the owner is being carried out, owes a duty to persons rightfully on the premises to keep the premises in a reasonably safe condition while the contract is in the course of performance. *Hand v. Rorick Constr. Co., supra*.

The contract between Hormel and Lueder called for the construction by Lueder for Hormel for a specified sum a grocery products addition at 900 S. Platte Avenue, Fremont, Nebraska, in accordance with certain drawings and specifications incorporated into the contract by reference. The construction constituted an addition to Hormel's existing plant and the contract provided that the work be done in four phases, the order of construction of the various phases of the addition being specified. The steps where the accident occurred provided ingress and egress for the employees of the contractor or subcontractors and were a portion of the area designated C on the plot plan.

Also incorporated in the contract were certain general conditions. These general conditions were contained in AIA document A201, April 1970 edition. Article 10 of the general conditions made the contractor responsible for "initiating, maintaining and supervising all safety precautions and programs in connection with the Work," as well as requiring it to take all reasonable safety precautions for the safety of all employees on the work and all other persons who might be affected thereby. Paragraph 10.2.2 provided: "The Contractor shall comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss. He shall erect and maintain, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations . . . ." Article 4 provided in part:
"4.3 SUPERVISION AND CONSTRUCTION PROCEDURES
"4.3.1 The Contractor shall supervise and direct the Work, using his best skill and attention. He shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for co-

ordinating all portions of the Work under the Contract.

"4.4 LABOR AND MATERIALS

"4.4.1 Unless otherwise specifically noted, the Contractor shall provide and pay for all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for the proper execution and completion of the Work."

The contract designated Hormel's engineering division as its architect. The general conditions provided that the architect should have access to the "Work"; further providing: "The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an architect, he will keep the Owner informed of the progress of the Work and will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor. The Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, and he will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents." The general conditions also included the following:

"4.16 CLEANING UP

"4.16.1 The Contractor at all times shall keep the premises free from accumulation of waste materials or rubbish caused by his operations. At the completion of the Work he shall remove all his waste materials and rubbish from and about the Project as well as all his tools, construction equipment, machinery and surplus materials, and shall clean all glass surfaces and leave the Work 'broomclean' or its equivalent,

except as otherwise specified.

"4.16.2 If the Contractor fails to clean up, the Owner may do so and the cost thereof shall be charged to the Contractor as provided in Paragraph 3.4." Paragraph 3.4 pertains to the owner's right to carry out the work, and paragraph 3.4.1 states: "If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents or fails to perform any provision of the Contract, the Owner may, after seven days' written notice to the Contractor and without prejudice to any other remedy he may have, make good such deficiencies. In such case an appropriate Change Order shall be issued deducting from the payments then or thereafter due the Contractor the cost of correcting such deficiencies, including the cost of the Architect's additional services made necessary by such default, neglect or failure. The Architect must approve both such action and the amount charged to the Contractor. If the payments then or thereafter due the Contractor are not sufficient to cover such amount, the Contractor shall pay the difference to the Owner."

The trial judge made a finding that, as a matter of law, the relationship between Hormel and Lueder, at least insofar as safety measures and cleaning up were concerned, was that of master and servant and that the evidence of Lueder's negligence with respect to those matters was imputable to Hormel. In so doing, he seemed to rely upon the fact that the inspecting architect was an employee of Hormel, rather than one retained by Hormel under the terms of a contract for preparation of plans and specifications or other contract, and the provision for cleanup contained in the general conditions of the contract which we have earlier cited. The court did not cite any authority for this construction of the contract, and neither does Sullivan.

Sullivan relies upon our holding in the case of *Simon v. Omaha P. P. Dist.*, 189 Neb. 183, 202 N.W.2d 157 (1972). In that case we held: "The duty of an owner

in control of the premises where work performance under a contract with the owner is to be executed is to exercise reasonable care to keep the premises in a safe condition while the contract is in the course of performance . . . . The possessor of land retaining control is subject to liability for personal injuries to business visitors caused by a natural or artificial condition thereon if he knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk of harm to the invitee." (Syllabi of the court.) *Simon v. Omaha P. P. Dist., supra*, is distinguishable under the evidence in the case before us. In *Simon*, the owner was liable because of its own negligence and that of its agent. In that case, O.P.P.D. let no general contract; it maintained control of the premises under construction and controlled and supervised the work of the various contractors through its agent and engineering firm which it had retained for that purpose. In *Hand v. Rorick Constr. Co.*, 190 Neb. 191, 206 N.W.2d 835 (1973), we had occasion to so distinguish the *Simon* case. We there said at 194-95, 206 N.W.2d at 837: "The plaintiff relies upon, among other cases, our holding in *Simon v. Omaha P. P. Dist.*, 189 Neb. 183, 202 N.W.2d 157, which was decided after the trial of this case. Our holding there is clearly distinguishable. In that case the instrumentality which caused the injury was a condition of the premises and the failure of the owner, who was its own general contractor and was in absolute control of the premises through its retained engineer (to whom it had entrusted implementation of safety measures), to cover or barricade an opening as required by the safety code. The condition had existed for many months. The owner and its agent, who had complete control of all safety on the premises, had the right, opportunity, and duty to cover or barricade the opening. This was not the subcontractor's obligation."

In the case at hand, the evidence shows that Hormel did not retain control of the premises, nor assume responsibility for safety measures. The evidence is that, although on December 14, 1972, the "area C" was entirely enclosed, the general contractor was in possession of the premises; that some minor items remained to be finished; and that the final cleanup of that area was in progress. The "work" on the general contract was not completed until August 10, 1973, and possession delivered to the owner sometime after that date.

We have made an extensive search for precedent holding that under the contract provisions relied upon by the trial court in this case the relationship between the owner and the independent contractor created the relationship of master and servant even for the limited purpose of cleanup or safety. We have found none, and none of the parties cite any authority on point. The fact that the inspecting architect was an employee of the owner rather than one otherwise retained is not significant. The architect is the agent of the owner in either case. The question is, what is his authority. Where the inference is clear that there is or is not a master and servant relationship, the determination should be made by the court as a matter of law. *Peetz v. Masek Auto Supply Co.*, 161 Neb. 588, 74 N.W.2d 474 (1956); *Vontress v. Ready Mixed Concrete Co.*, 170 Neb. 789, 104 N.W.2d 331 (1960); *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979).

We hold that under the contract before us, and in particular the contract provisions we have cited, especially those with reference to safety and cleanup, the relationship of owner and independent contractor was not converted to that of master and servant. The emphasis is on the term "independent," not the term "contractor." See Restatement (Second) of Agency, Introductory Note § 218 at 480-81 (1958), which we cited earlier. The negligence of Lueder was, therefore, not imputable to Hormel.

We now turn to the question of whether the court was correct in directing a verdict for Sullivan on the issue of liability, rather than submitting the issues of Lueder's negligence and Sullivan's possible contributory negligence to the jury.

Sullivan was employed at the Hormel plant addition from sometime in September 1972 until late January 1973. It is undisputed that the means of ingress and egress for the workmen of all trades employed in the constructing and equipping of the addition was through the door, landing, and stairs where the accident occurred. Sometime in November 1972 there had been a snowstorm, apparently followed by other storms. Witnesses, whose testimony was not contradicted, stated that on December 14 the landing was snow covered and the steps were covered with ice. According to some of the testimony, including Sullivan's, the icy conditions had existed continuously from the time of the November 1972 storm until the date of the accident. The steps had never been cleaned during that period. According to one of the witnesses, the conditions existed off and on during that period. Complaints had been made about the condition of the steps to Lueder's superintendent by Sullivan and others. Sullivan was the millwright foreman for Citrus and some of Sullivan's men had complained to him. The Lueder superintendent, however, denied receiving such complaints or that he had any responsibility with reference to keeping them in safe condition for use. He felt this way because, in his judgment, they were finished on that part of the building. There was some testimony that on one occasion sand had been spread in the area following an ice storm which occurred sometime prior to December 14. At the time of that storm, one workman had slipped and fallen on the ice after descending the stairway and stepping on the ground. The sanding apparently occurred after that incident. There was also testimony that salt and sand were available in containers at the doorway on

December 14, but no evidence that the stairway had been sanded or salted on December 14 or on any date other than as above mentioned. One witness described the ice on the steps on the date of the accident as being "mounded" from repeated thawing and freezing.

Approximately 25 or 30 workmen were on the job on December 14 and the inference is that all were using the same means of ingress and egress.

The exit in question was located on the east side of the addition and consisted of a metal door of ordinary width at floor level. The door opened onto an exterior platform which was connected with six steps located adjacent to and parallel to the building and descending to a concrete slab at ground level. The outer edges of the landing and steps were guarded by a handrail constructed of 1½- to 2-inch welded pipe, consisting of posts and a double rail.

Sullivan and three other workmen who left with him at the same time that day were all aware of the icy condition of the steps.

Sullivan testified that when he went to work on the morning of December 14, he entered through the designated entry. The steps were icy and there was debris on them. "There was always paper, plastic, nuts or bolts or something like that." Immediately adjacent to the landing (i.e., within about 2 feet) to the south of the door assigned to the workmen was an overhead loading door. Sullivan testified that Lueder's cleanup people would pile debris of various kinds, to wit, lumber, plastic, paper, nuts and bolts, in the building next to the door until there was an accumulation big enough to load. Then a truck would be backed to the doorway and Lueder's laborers would scoop the debris into the truck. Sometimes they were careless and missed the truck and some of it would get on the stairway.

At this point we describe the accident by summarizing and quoting Sullivan's testimony. He and three other workmen left at the same time at about 4:20

p.m. He took hold of the railing with his right hand and began to descend the stairs. He stated: "I just stepped down on a step and there was a bolt there and it rolled with me and I just hit my heel on the next step down. I didn't fall down; I just hit my foot. Q. Did the bolt move? A. Yes. It rolled down to the next step and then when my heel fell on it, well, it was there, so I stopped Richard and Hugh and Floyd and I picked the bolt up and threw it over on the railroad tracks." The heel of his right foot hit the bolt. The bolt was in the ice "halfway frozen," i.e., half of it in the ice. He had not seen the bolt before he stepped on it. It was a bolt about ⅜ x 3 inches in size. He had no idea how long the bolt had been there. Another witness also testified that at various times there was debris of various types on the steps.

Sullivan testified that he was the first of the workmen to descend the steps.

We have frequently held: "Where different minds may reasonably draw different conclusions or inferences from the evidence adduced concerning the issues of negligence or contributory negligence and the degree thereof when one is compared with the other, such issues must be submitted to the jury." *Maxwell v. Lewis*, 186 Neb. 722, 726, 186 N.W.2d 119, 122 (1971). See, also, *Jensen v. Hawkins Constr. Co.*, 193 Neb. 220, 226 N.W.2d 346 (1975); *Swiler v. Baker's Super Market, Inc.*, 203 Neb. 183, 277 N.W.2d 697 (1979); *Graham v. Simplex Motor Rebuilders, Inc.*, 189 Neb. 507, 203 N.W.2d 494 (1973).

As to the negligence of Lueder, it is clear that Lueder had a duty, not only under the terms of the contract but also at common law, as the independent contractor in possession and control of the premises to keep those premises in such condition that they afforded a reasonably safe place to work for persons working on or otherwise rightfully on the premises. *Hand v. Rorick Constr. Co.*, 190 Neb. 191, 206 N.W.2d 835 (1973); *Simon v. Omaha P. P. Dist.*, 189 Neb. 183,

202 N.W.2d 157 (1972). The facts showing that Lueder violated that duty are not in dispute. The evidence shows that the workmen were restricted to the use of the one entryway. The icy condition of the entryway steps had existed for a prolonged period of time. The general contractor had, or ought to have had, notice of the condition and did nothing at all to remedy an easily correctable unsafe condition. It is undisputed that at least frequently, if not always, debris, which made footing even more hazardous, was present on the steps. It is clear, therefore, that Lueder did not fulfill its obligation of keeping that part of the premises under its control under a reasonably safe condition. The court was, therefore, correct in directing a verdict against Lueder on the issue of that defendant's negligence.

As to Sullivan's negligence and its degree as compared with that of Lueder's, there are matters on which minds might reasonably differ. It is a reasonable inference from the evidence, including Sullivan's own testimony, that the ice alone would not have caused the accident, but that the presence of the bolt was necessary for the slip to have occurred. It is clear from Sullivan's testimony that he not only knew of the icy condition but also that debris was, at least frequently, on the exit way. According to his own words, there was "always" debris on the steps. Many persons were using the steps on that same day, as the evidence indicates that 25 or 30 workmen were on the job, and it may be inferred that they negotiated the steps safely. Sullivan acknowledged that he did not see the bolt before he stepped on it. It appears that reasonable minds could arrive at the conclusion that he did not see the bolt because he was not maintaining a reasonable lookout for debris which he should have known was very likely to be there, and that the slip could have been avoided by a more careful lookout and placement of his feet as he descended the stairs. The trial court should, therefore, have submitted to the jury the question of Sullivan's contributory negligence

in the above respect and given the usual comparative negligence instruction.

We direct that the judgment be reversed as to the defendant Hormel and the cause dismissed; and that as to defendant Lueder, the judgment be reversed and the cause remanded for a new trial with appropriate instructions to the jury in accordance with this opinion.

REVERSED AND REMANDED.

WHITE, J., dissenting.

I dissent from that portion of the majority opinion reversing the District Court's directed verdict in favor of the plaintiff on the issue of his contributory negligence.

The majority feels that reasonable minds could differ as to whether Mr. Sullivan was negligent in descending the steps, since he did not see the bolt before he stepped on it. However, even as the majority notes, "25 or 30 workmen were on the job, and it may be inferred that they negotiated the steps safely." The fact that there were no falls on these steps on December 14, 1972, prior to plaintiff's fall would lead him to assume, and reasonably so, that no greater amount of care was necessary in his descent of the icy steps than the precautions which he did take, i.e., a slow descent and gripping the handrail tightly, as the District Court noted; that even though he slipped, he did not fall but maintained his balance when his foot hit the next step. While the previous 25 or 30 descents may have loosened the bolt sufficiently to cause it to break free during Mr. Sullivan's descent, this does not suggest Sullivan's negligence but relates to the undisputed negligence of defendant Lueder in allowing the bolt to be on the steps in the first place. Therefore, I would affirm the District Court on the issue of the plaintiff's contributory negligence.

KRIVOSHA, C.J., joins in this dissent.