OMAHA WORLD-HERALD, APPELLEE, V.
WILLIAM DERNIER, APPELLANT, AND
COMMISSIONER OF LABOR OF THE STATE OF NEBRASKA, APPELLEE.
570 N.W.2d 508

Filed October 24, 1997.    No. S-95-321.

Bruce H. Brodkey, Edith T. Peebles, and Lisa M. Line, of Brodkey, Cuddigan & Peebles, for appellant.

Soren S. Jensen, of Erickson & Sederstrom, P.C., for appellee Omaha World-Herald.

John F. Sheaff and John H. Albin for appellee Commissioner of Labor.

WHITE, C.J.,. CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

PER CURIAM.

This is an action for unemployment compensation benefits. The defendant-appellant, William Dernier, entered into a five-page "Independent Distributor Agreement" with the plaintiff-appellee, Omaha World-Herald, calling for Dernier to purchase from the World-Herald newspapers at fixed prices and to sell them in a delivery area designated by the World-Herald by placing them in news racks which Dernier rented from the World-Herald and through retail outlet dealers such as stores and service stations. Dernier's compensation consisted of the difference between the price Dernier paid the World-Herald and the prices at which he sold the newspapers. The amount Dernier charged the dealers was determined by agreement between Dernier and the dealers; the World-Herald determined the price of the newspapers dispensed from the news racks.

The World-Herald had the right to suggest the locations of the news racks, and only World-Herald newspapers and promotional signs and materials supplied by the World-Herald could be placed in them. On occasion, the World-Herald caused the move of a news rack to a less profitable location. Although

Dernier was responsible for the basic appearance and maintenance of the news racks, the World-Herald submitted a list of the news racks to the city to check for compliance with its codes. If the news racks were found to be in violation of the codes, the World-Herald was fined.

Dernier billed and collected for his own accounts and agreed to prepare and distribute bills to those who did not pay the World-Herald directly. He determined the number of newspapers he wished to purchase each day, but was obligated to stock the news racks and supply the dealers with sufficient newspapers so as to avoid "sold out" conditions. Moreover, the World-Herald could unilaterally increase or decrease the size of Dernier's orders. Dernier paid the World-Herald weekly for the newspapers he purchased, and although title to the newspapers passed to Dernier as he took delivery of them, he could return any unsold newspapers for full credit.

Dernier was to supply the World-Herald with a constantly updated "run" list showing the location of the news racks, the dealers he was serving, and the amount of sales to each of the dealers. In addition, the World-Herald supplied Dernier with a "delivery list" which showed the name, address, and actual sale by day of all "single copy" accounts in Dernier's delivery area, which list remained the property of the World-Herald and was to be kept current by Dernier as a confidential document.

The agreement required Dernier to provide at his own expense a substitute of his choice to perform his contractual obligations in the event of his "illness, disability, or absence, or if for any other reason" he was "unable to perform" his responsibilities. Dernier also agreed to provide a work force adequate to perform his contractual obligations and agreed further that said work force would be under his direction and control, and any persons so engaged would be his "employees and/or contractors." Dernier had engaged three persons to help him.

While the agreement permitted Dernier to work for others, the arrangement could be terminated if Dernier failed to make deliveries of the World-Herald newspapers within specified times for weekly morning editions, weekly afternoon editions, and weekend editions. Although the agreement is not entirely clear, the evidence establishes that the times were 6:30 a.m.,

5 p.m., and 6 a.m., respectively. Either party could terminate the agreement with or without cause upon 30 days' notice, and the World-Herald could terminate the agreement immediately without notice upon Dernier's commission of any wrongful act.

The agreement recited that Dernier was to be considered an independent contractor and that he was responsible for paying expenses and providing vehicles, employees, and insurance, and contained a mechanism for securing Dernier's performance.

Dernier was expected to increase his sales of newspapers by 3 percent per year, and the failure to do so was cause for termination of the agreement. The agreement was ultimately terminated on or about February 8, 1994, by the World-Herald for Dernier's failure to place advertisement material as required and for not selling enough newspapers. Dernier had earned approximately $40,000 per year under the agreement; the World-Herald did not make deductions from Dernier's compensation for federal, state, or Social Security taxes.

A Department of Labor claims deputy determined that Dernier was not entitled to unemployment insurance benefits, the department's appeal tribunal reversed the deputy's decision, and the district court reversed the decision of the appeal tribunal. Dernier then appealed to the Nebraska Court of Appeals. Pursuant to our power to regulate the caseload of the Court of Appeals, we, on our own motion, removed this case to our docket.

In an appeal from the appeal tribunal to the district court regarding unemployment benefits, the district court conducts a review de novo on the record; on review by the Court of Appeals or the Supreme Court, the judgment of the district court may be reversed, vacated, or modified for errors appearing on the record. When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Law Offices of Ronald J. Palagi v. Dolan*, 251 Neb. 457, 558 N.W.2d 303 (1997). However, when reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Zimmerman v. Douglas Cty. Hosp.*, 252 Neb. 583, 563 N.W.2d 349 (1997).

The Employment Security Law, Neb. Rev. Stat. §§ 48-601 through 48-671 (Reissue 1993), provides for the payment of unemployment compensation benefits to otherwise eligible individuals having qualified for such through prior employment, §§ 48-624 and 48-625. The act defines employment as any "service performed . . . for wages or under any contract of hire, written or oral, express or implied." § 48-604(1). The issue, thus, is whether Dernier performed services for "wages," and if not, whether he performed services under a "contract of hire."

The act defines "wages" as being "all remuneration for personal services, including commissions and bonuses and the cash value of all remunerations in any medium other than cash." § 48-602(16). While we have not addressed whether participation in arrangements such as that presented here results in the payment of wages, other jurisdictions have considered similar arrangements and provide guidance on the issue.

The parties in *Matter of Balhorn-Moyle Petroleum Co.*, 315 N.W.2d 481 (S.D. 1982), an action to recover unemployment compensation contributions, entered into an agreement whereby the operator received gasoline provided by the petroleum company and sold it at a service station which the company owned and the operator ran. The operator reimbursed the company for the gasoline he sold, retaining a portion of the sale. Although the agreement required the operator to run the station full time, he determined the hours of operation, was free to hire employees, and had his wife working with him. He was also free to conduct at his own risk other service-station-related business activities and maintained a repair service, keeping his own records on the entire operation. The court determined that the relationship between the company and the operator was that of supplier and distributor and that the operator was thus not receiving wages from the company. As a result, the company did not owe contributions to the unemployment compensation fund.

In *Donaldson v. Gordon*, 397 Ill. 488, 74 N.E.2d 816 (1947), another action to collect unemployment compensation contributions, one holding a franchise for the sale of floor coverings entered into several contracts with individuals who would find customers, survey their premises, offer to install the covering for a certain price, and submit the offer to the franchisee, who

had the right to accept or reject the estimate. The individual could sell any other noncompetitive installation, was not required to work certain hours, made no reports of sales, bore all expenses, was not controlled in the solicitation of business, and had the right to employ assistants. After the covering was installed and the costs of installation were deducted from the gross amount received from the sale, the remaining amount was divided equally between the franchisee and the individual. If the installation resulted in a loss, the franchisee and the individual shared it equally. In holding that the franchisee was not liable for contributions as he was not paying wages, the court reasoned that wages imply a fixed sum for services rendered, without a deduction and without taking into consideration whether the employer will make or lose money by the transaction.

The corporation in *Fuller Brush v. Ind. Comm. of Utah et al.*, 99 Utah 97, 104 P.2d 201 (1940), engaged in the business of manufacturing and selling brushes, brought an action to challenge a determination that it was liable for unemployment compensation contributions. Its method of doing business was to enter into contracts with dealers who were to go door to door in specific territories to sell brushes the corporation manufactured. The dealers were supplied with a sample case of brushes which they purchased or leased. All goods were sold to the dealer for cash and resold to purchasers at an increased price. The dealers set their own hours, made no reports of sales, worked in their own manner, and could sell for cash or credit. The court reasoned that because the dealers were free from control by the corporation, obtained their remuneration from their ability to sell the brushes at an advanced price, and assumed the risk of profit, their services were not rendered for wages, and that the corporation was thus not liable for unemployment compensation contributions.

The foregoing cases persuade us that Dernier was not performing services for wages; his income was determined not by any amount paid by or through the World-Herald, but, rather, by whether he made a profit or suffered a loss, which was in part determined by how he chose to fulfill his contractual obligations to the World-Herald.

Whether he performed his services under a contract of hire is a different matter. Although some of the foregoing courts also concluded there was no contract of hire, those determinations are not relevant to our analysis because they were made under statutory provisions or interpretations which made the existence of a contract of hire dependent upon the payment of wages. While our act does not define contract of hire, it is clear that it cannot be construed as depending upon the payment of wages, for such a construction would render meaningless half of the definition of "employment," which depends upon the performance of services for wages *or* under a contract of hire. Section 48-604(1) does not, as it easily could have if such were intended, define "employment" as any "service performed . . . for wages under a contract of hire . . . ." The controlling rule in this regard is that in construing a statute, a court must attempt to give effect to all of its parts, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless; it is not within the province of a court to read anything plain, direct, and unambiguous out of a statute. *In re Interest of Rondell B.*, 249 Neb. 928, 546 N.W.2d 801 (1996).

Here, it is clear that Dernier was performing services for the World-Herald under a contract; the question is whether he did so under a contract of hire. It must be noted at this point that § 48-604(5) reads, in relevant part: "Services performed by an individual *for wages* shall be deemed to be employment, unless it be shown to the satisfaction of the commissioner that" the so-called ABC test is met. (Emphasis supplied.) Since § 48-604(5) refers only to services performed for wages, the ABC test embodied therein does not apply in determining whether one engages in employment under a contract of hire.

In the absence of a statutory definition, we hold that one performing services under a contract but not receiving wages, as defined by § 48-602(16), performs services under a contract of hire unless one is an independent contractor, as defined by the common law. See *Erspamer Advertising Co. v. Dept. of Labor*, 214 Neb. 68, 333 N.W.2d 646 (1983) (holding that under statute which did not provide, as it does presently, that ABC test is complete as written and not codification of common

law, salesperson over whom company exercised little control was independent contractor). See, also, *Commissioner of Labor v. Lyric Co.*, 224 Neb. 190, 397 N.W.2d 32 (1986) (holding that salespersons over whom company exercised little control were independent contractors where company met then-current version of ABC test); *Shamburg v. Shamburg*, 153 Neb. 495, 45 N.W.2d 446 (1950) (holding that for purposes of workers' compensation statute, relationship of employer and employee same as relationship of master and servant, except that to be employee as distinguished from servant, one must serve under contract of hire).

We reviewed the common law of independent contractors in two recent workers' compensation cases: *Larson v. Hometown Communications, Inc.*, 248 Neb. 942, 540 N.W.2d 339 (1995), and *Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 530 N.W.2d 916 (1995). In *Larson*, we held a 10-year-old carrier who was required to deliver newspapers at specified times and whose duties were detailed in a manual to be an employee, notwithstanding that she had, with the knowledge of the publisher, shared her route with another. In *Hemmerling*, we held a taxicab driver to be an employee where the company held the certificate of public convenience to provide taxicab service under state-regulated rates and exercised the exclusive control, supervision, and possession of the vehicle; required that the vehicle be inspected and serviced by it; designated where the driver could solicit passengers; and provided complex training concerning its operations and service philosophy.

Under the common law, an independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the methods or means used. *Hemmerling, supra*; *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979). There is no single test for determining whether one performs services for another as an employee or as an independent contractor; rather, the following factors must be considered:

" '(1) the extent of control which, by the agreement, the employer may exercise over the details of the work, (2)

whether the one employed is engaged in a distinct occupation or business, (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision, (4) the skill required in the particular occupation, (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work, (6) the length of time for which the one employed is engaged, (7) the method of payment, whether by the time or by the job, (8) whether the work is part of the regular business of the employer, (9) whether the parties believe they are creating an agency relationship, and (10) whether the employer is or is not in business.' "
*Larson,* 248 Neb. at 953-54, 540 N.W.2d at 348. Accord, *Hemmerling, supra;* Restatement (Second) of Agency § 220 (1958). No one of these factors being conclusive, they must be weighed in determining whether an employment or independent contractor relationship exists. *Larson, supra.*

### (1) Control.

While not in itself determinative, control is the most important factor to be considered in determining whether someone acts as an independent contractor or as an employee. *Larson, supra; Eden v. Spaulding,* 218 Neb. 799, 359 N.W.2d 758 (1984). In considering this factor, a distinction must be made between control over the specific manner in which the work is performed and control over the final result of the work. " '[E]ven the employer of an independent contractor may, without changing the status, exercise such control as is necessary to assure performance of the contract in accordance with its terms.' " *Larson,* 248 Neb. at 954, 540 N.W.2d at 348, quoting *Stephens, supra.*

The record reflects that both the World-Herald and Dernier exerted some degree of control in their business relationship. The World-Herald defined the geographic territory in which Dernier provided services; set the times by which Dernier was to pick up newspapers under normal conditions; established the retail price at which newspapers are sold from news racks

within Dernier's territory; and required Dernier to insert advertising materials in the news racks. Dernier was required to supply the World-Herald with a weekly list of single copy accounts and locations in his territory; the list was designated as the property of the World-Herald. This represented some degree of control over the manner in which Dernier was to do his work. However, the World-Herald did not issue any comprehensive written handbooks, policies, or guidelines defining the manner in which Dernier was to perform specific tasks, such as those found to be of significance on the issue of control in *Larson* and *Hemmerling*.

The record reflects that the World-Herald would sometimes suggest additional news rack locations within Dernier's territory and increase the size of his daily orders when it anticipated that daily demand for newspapers would be higher than normal because of specific news content. The written agreement between the parties required that Dernier increase newspaper sales in his territory by an average of 3 percent per year. These measures did not relate to the means or methods by which Dernier was to perform his work, but, rather, to the result which he was expected to achieve; i.e., to maximize the number of newspapers sold from vending racks and single copy sales locations in his territory and to avoid "sold out" conditions at such locations.

Dernier possessed and exercised the right to control the manner in which he performed many aspects of his work under the agreement. He decided which tasks he would perform personally and which he would delegate to persons whom he hired or contracted with to help him. He was responsible for obtaining a substitute in the event that he was unable to perform his contractual obligations. The World-Herald retained no right of approval with respect to any helpers or substitutes, and the agreement specifically provided that the "work force" provided by Dernier would be under his exclusive direction and control. The record reflects that Dernier devoted his own efforts to the contract and also hired helpers whom he paid.

Dernier was free to place additional news racks and solicit additional single copy dealers within his territory. He had full authority to negotiate the price at which he would sell newspa-

pers to dealers. He testified that on one occasion he compensated for an increase in fuel costs by increasing the per-copy price which he charged dealers.

Dernier normally determined the number of newspapers to be included in his daily order, but, as mentioned earlier, the World-Herald could change the size of his order. Once he picked up his order, he distributed the newspapers in his territory as he saw fit without any direct involvement or supervision by the World-Herald. The World-Herald exercised no control over Dernier's actual operation of the vehicle which he used to transport newspapers, or the route which he traveled in servicing his territory. See *Stephens v. Celeryvale Transport, Inc.,* 205 Neb. 12, 286 N.W.2d 420 (1979). Dernier testified that he normally communicated with his contact person at the World-Herald only when he went in to pay his weekly bill and once or twice a week by telephone.

Dernier performed all billing and collections on his accounts. He reported the number of newspapers which he obtained from the World-Herald and the number he returned, but did not report the dollar amount of his collections or the net amount which he realized after deducting his operating expenses. Dernier was not subject to any performance evaluations by the World-Herald.

From the record, we conclude that the degree of control which Dernier exercised over the method and manner of performing his work was greater than that exercised by the World-Herald.

## (2) Distinct Business.

By executing the agreement, Dernier represented that he operated an "independent business enterprise" which was capable of providing the services specified in the agreement. The agreement specifically provided that Dernier "may engage in any other business or employment, including the delivery and sale of other publications or products," so long as it did not interfere with performance of his obligations under the agreement. Dernier testified that he devoted all of his time to the World-Herald distributorship and did not perform services for any other entity. In this respect, the case is distinguishable from *Eden v. Spaulding,* 218 Neb. 799, 359 N.W.2d 758 (1984), in

which the trucker who was held to be an independent contractor performed work for several customers. However, under the terms of the agreement, Dernier could have freed all or a portion of his own time for other business by delegating tasks to his helpers. We have recognized that the ability of a worker to "substitute the services of another for his own is indicative of the status of independent contractor." *Stephens*, 205 Neb. at 20, 286 N.W.2d at 425.

### (3) Whether Work Normally Done by Employee or Independent Contractor.

The only evidence with respect to this factor is the testimony of a World-Herald employee that the newspaper utilizes a total of 18 distributors under arrangements similar to that which it had with Dernier and Dernier's testimony that he was aware of a distributor in Council Bluffs, Iowa, who "carried the Wall Street Journal and the [Council Bluffs] Nonpareil."

### (4) Skill Required.

No specialized skill was required to pick up newspapers from the World-Herald plant and transport them to the news racks and dealer locations within Dernier's territory. However, some degree of managerial skill was necessary in order for Dernier to perform his contractual obligations and realize a profit from his efforts. These included the negotiation of the price at which he sold newspapers to dealers and the management of his personnel and other operating expenses.

### (5) Instrumentalities, Tools, and Place of Work.

As noted, Dernier's territory was defined by the World-Herald. In addition, the World-Herald owned the news racks which it leased to Dernier for 50 cents per week. Dernier purchased string and plastic bags from the World-Herald. However, Dernier furnished the most important piece of equipment necessary to perform the contract—the vehicle used to transport newspapers from the World-Herald's plant to the various points of sale in Dernier's territory. He also paid all costs incurred in operating the vehicle without reimbursement from the World-Herald. In *Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 530

N.W.2d 916 (1995), we held that the taxicab company's ownership of and right to control the taxicab used by a driver was a significant indicator of control necessary to establish an employment relationship. In this case, Dernier's ownership and control of the vehicle used to transport newspapers supports an inference that he was an independent contractor. See, *Anthony v. Pre-Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991); *Eden, supra; Stephens, supra.*

### (6) Length of Time Engaged.

Dernier's contractual relationship with the World-Herald was ongoing and not limited to a specific duration or task. This is suggestive of an employment relationship.

### (7) Method of Payment.

Dernier's compensation consisted of the difference between the amount which he collected for the newspapers he sold and the amount which he paid the World-Herald for the newspapers and the operating expenses which he incurred. There was no actual payment made to him by the World-Herald, and no Social Security or income taxes were deducted from the compensation he realized.

"Normally an employee is compensated while he works. An independent contractor's compensation, on the other hand, usually depends upon whether he makes a profit from the contract." *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 22, 286 N.W.2d 420, 426 (1979). If such "profitability depends upon the worker's own capital investment, management, and the difference between income and expense, that is an indication of independent contractor status." *Id.* at 20, 286 N.W.2d at 425. Also, "[t]he deduction of social security taxes and the withholding of income tax tends to indicate an employer-employee relationship, while the failure to do so is a contrary indication." *Id.*

In *Larson v. Hometown Communications, Inc.*, 248 Neb. 942, 540 N.W.2d 339 (1995), the newspaper carrier's compensation was based on the difference between the amount which the carrier paid for the newspaper and the subscription price fixed by the publisher, as well as a fixed amount per each advertising insert she was required to deliver. No payroll or Social Security

taxes were withheld. We affirmed a finding that this constituted a " 'payment of wages on a piece or quantity basis' " which was " 'not inconsistent with the status of an employee.' " *Id.* at 958, 540 N.W.2d at 350. We further held that the failure to withhold taxes was not indicative of either employee or independent contractor status, because of state and federal laws exempting the normal withholding of such taxes from the earnings of newspaper carriers under the age of 18. The instant case is distinguishable because Dernier was not paid "wages," as discussed above, and the statutory exemption from withholding of taxes is inapplicable.

### (8) Whether Work Is Part of Regular Business.

In *Larson*, it was undisputed that the delivery of newspapers to customers by carriers was a significant part of the publisher's business. In this case, we reject the World-Herald's contention that it is in the business of publishing newspapers, not selling them. Clearly, the sale of newspapers, whether from news racks, dealer locations, or by subscription, is an integral part of the business in which the World-Herald is engaged. This factor would weigh in favor of an employment relationship.

### (9) Intent of Parties Regarding Nature of Relationship.

The agreement signed by Dernier provides:

8. The Publisher [World-Herald] is interested only in the results to be obtained by the Distributor [Dernier] as described in this Agreement, and the manner and means to be employed by the Distributor [Dernier] are matters entirely within the authority and discretion of the Distributor [Dernier]. Distributor [Dernier] warrants that he/she owns and operates an independent business enterprise and consequently, Distributor [Dernier] is and shall remain an independent contractor, solely responsible for (1) obtaining and maintaining vehicles, supplies and equipment used to perform distribution and related services; (2) paying all expenses incurred in providing distribution and related services; (3) selecting and controlling the means used to perform distribution and related services; (4) hiring, compensating, controlling and discharg-

ing persons utilized by him/her to provide distribution and related services; and (5) satisfying all obligations concerning applicable taxes . . . .

We have recognized that whether the parties believed that they were creating a master-servant relationship is an "important guideline" in determining the legal nature of the relationship. *Eden v. Spaulding*, 218 Neb. 799, 806, 359 N.W.2d 758, 763 (1984). When there is a written contract between the parties which denominates and describes the relationship as that of independent contractor, and nothing in the manner of performance by the parties is inconsistent with the relationship described, then the independent contractor is not deemed to be an employee as a matter of law. *Knowlton v. Airport Transportation Co.*, 235 Neb. 96, 454 N.W.2d 278 (1990). The existence of such a contractual provision " 'must . . . be considered and may be of prime importance,' " but " 'a writing which merely denominates the relationship may not be used to conceal the true arrangement.' " *Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 927, 530 N.W.2d 916, 921 (1995), quoting *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979).

The agreement signed by Dernier clearly defined his relationship with the World-Herald as that of an independent contractor. As a competent adult, he is charged with knowledge and understanding of the contract he signed. See *Walker v. Walker Enter.*, 248 Neb. 120, 532 N.W.2d 324 (1995). In this regard, this case is distinguishable from *Larson*, in which we affirmed a finding that the intent of a 10-year-old newspaper carrier could not be conclusively determined from contractual language describing her as an independent contractor.

Dernier testified that he did not consider himself a "professional newspaper distributor" and that he thought he would be "fired" if he did not comply with requests or suggestions by the World-Herald. However, taken as a whole, his factual testimony as to the actual nature of his relationship with the World-Herald is consistent with that described in paragraph 8 of the agreement, quoted above. Dernier testified that he did not withhold payroll taxes from the amounts which he paid his part-time helpers because he considered their relationship with him to be

the same as his relationship with the World-Herald, thus supporting an inference that he understood that relationship to be one of an independent contractor.

### (10) Whether Employer Is or Is Not in Business.

It is undisputed that the World-Herald is a business enterprise, and this factor would therefore weigh in favor of a finding that Dernier was an employee.

Considering and weighing these factors, based primarily upon the language of the agreement, the degree of control which Dernier exercised over his performance of the agreement, the method of compensation, and the fact that Dernier owned and controlled the primary item of equipment necessary to perform his work, we conclude that he was an independent contractor and not performing services under a contract of hire. We therefore affirm the judgment of the district court.

AFFIRMED.

WHITE, C.J., dissenting.

The Employment Security Law, Neb. Rev. Stat. §§ 48-601 through 48-671 (Reissue 1993), provides for the payment of unemployment compensation benefits to otherwise eligible individuals having qualified for such through prior employment, §§ 48-624 and 48-625. The act defines employment as any "service performed . . . for wages or under any contract of hire, written or oral, express or implied." § 48-604(1). The majority determined that Dernier was not entitled to unemployment compensation because he did not receive "wages" or engage in a "contract of hire." I dissent.

The majority determined that a person performing services under a contract, but not receiving wages, is providing services under a contract of hire unless the person is an "independent contractor." The majority concedes that Dernier was "performing services" for World-Herald under a contract, but determined Dernier was not under a "contract of hire" because he was an independent contractor.

While there is no single test to determine whether one is an employee or an independent contractor, several factors must be considered. *Larson v. Hometown Communications, Inc.*, 248 Neb. 942, 540 N.W.2d 339 (1995); *Hemmerling v. Happy Cab*

*Co.,* 247 Neb. 919, 530 N.W.2d 916 (1995). We have recognized, however, that while no one factor is determinative, control is the most important factor to be considered in determining whether someone is an employee or an independent contractor. *Larson, supra; Hemmerling, supra; Eden v. Spaulding,* 218 Neb. 799, 359 N.W.2d 758 (1984).

In the instant case, the contract states that World-Herald is interested only in the results obtained by Dernier and that the manner and means by which Dernier fulfills his contractual obligations are left solely to him. The reality of the agreement, however, is otherwise. In fact, World-Herald retained the right to control, and exercised considerable control over, the methods and means by which Dernier performed his services.

First, World-Herald did not issue written handbooks, policies, or guidelines dictating the manner for performing specific tasks; yet, Dernier was prohibited from placing other materials in the racks and was required to insert advertising materials in the news racks. Second, Dernier determined whether he wanted to hire additional employees and was responsible for obtaining his own substitutes; yet, these decisions were effectively determined by World-Herald because they had the right to increase the size of Dernier's orders and they consistently required Dernier to increase his sales. Third, Dernier was free to place additional news racks and sell additional copies to dealers within his territory; yet, World-Herald determined the location of the racks, the price of the newspapers, whether any other materials could be placed in the racks, and what advertisements were to be inserted in the newspapers. Fourth, Dernier was free to negotiate the price at which he sold the newspapers to dealers; yet, World-Herald effectively made this decision because if Dernier was to make a living, he had to sell the papers at a greater cost than what World-Herald was charging him for the papers. Fifth, Dernier was allowed to distribute the newspapers as he saw fit; yet, aside from the fact World-Herald required Dernier to place enough newspapers in the racks to avoid being "sold out," World-Herald dictated the times and places he could pick up the newspapers. Sixth, World-Herald exercised no control over Dernier's operation of the vehicle he used to transport newspapers or the route which he traveled in servicing his ter-

ritory; yet, World-Herald effectively determined such issues, as World-Herald dictated the locations of the racks and the times and places Dernier could pick up newspapers. Seventh, Dernier performed all billing and collection for the newspapers; yet, World-Herald determined the price of the newspapers and required Dernier to provide World-Herald with a weekly list of single copy accounts and locations in his territory. In addition, Dernier's compensation consisted of the difference between the price Dernier paid World-Herald and the price at which he sold the newspapers. Thus, billing and collection procedures were effectively dictated by the whims of World-Herald's policies and procedures. Finally, Dernier was not subject to typical performance evaluations; yet, World-Herald required Dernier to consistently increase the number of newspapers sold and provide a weekly list of accounts and locations. Therefore, Dernier was not an independent contractor, but, rather, an employee entitled to unemployment compensation.

While the majority recognized a number of factors indicating that Dernier exercised the most control, reality dictates that World-Herald actually controlled the situation. I would therefore conclude that Dernier was not an independent contractor and reverse the decision of the district court.