JENNIFER LARSON, BY AND THROUGH HER FATHER AND NEXT
FRIEND, DAVID LARSON, APPELLANT, V. HOMETOWN
COMMUNICATIONS, INC., AND HOMETOWN OPERATIONS, INC.,
DOING BUSINESS AS THE FREMONT TRIBUNE, AND MARYLAND
CASUALTY INSURANCE COMPANY, APPELLEES.

540 N.W.2d 339

Filed December 8, 1995.  No. S-94-183.

Robert T. Cannella, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., and Stephen L. Gerdes for appellant.

Joseph W. Grant, of Gaines, Mullen, Pansing & Hogan, and Walter E. Zink II, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellees.

L. Michael Zinser, of Zinser & Domina, and Kenneth C. Stephan, of Knudsen, Berkheimer, Richardson & Endacott, for

amici curiae Nebraska Press Association, Nebraska Daily Publishers Association, Midwest Circulation Management Association, and Lincoln Journal Star.

Margaret C. Hershiser, of Koley, Jessen, Daubman & Rupiper, P.C., for amicus curiae Omaha World–Herald.

CAPORALE, FAHRNBRUCH, WRIGHT, CONNOLLY, and GERRARD, JJ.

WRIGHT, J.

## I. INTRODUCTION

Jennifer Larson sustained severe and permanent injuries while delivering newspapers. A trial judge of the Workers' Compensation Court found that Larson was an employee of the newspaper company and awarded workers' compensation benefits. A three–judge workers' compensation review panel reversed the findings of the trial judge. The Nebraska Court of Appeals reversed the decision of the review panel. Hometown Communications, Inc., and Hometown Operations, Inc., doing business as the Fremont Tribune, and Maryland Casualty Insurance Company (the defendants) filed a petition for further review, which we granted.

## II. SCOPE OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. Neb. Rev. Stat. § 48–185 (Reissue 1993).

The workers' compensation review panel may reverse or modify the findings, order, award, or judgment of the original hearing only on the grounds that the judge was clearly wrong on the evidence or the decision was contrary to law. Neb. Rev. Stat. § 48–179 (Reissue 1993).

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict

and will not be disturbed unless clearly wrong. *Shade v. Ayars & Ayars, Inc.*, 247 Neb. 94, 525 N.W.2d 32 (1994).

## III. FACTS

Hometown Communications, Inc., and Hometown Operations, Inc., publish and distribute the Fremont Tribune in Fremont, Nebraska. The Tribune is published 6 days per week. The Tribune instructs its carriers to deliver the newspapers by 5 p.m. on weekdays and before 7 a.m. on Saturdays and holidays. The carriers are charged 23.12 cents per paper, and they charge each customer $7 for 24 daily papers. In February 1991, the Tribune's circulation was 11,810 newspapers, of which 9,688 were home subscribers. Sixty-four percent of these subscribers received their papers via a carrier.

### 1. INDEPENDENT CARRIER AGREEMENT

In July 1989, Valerie Brauner entered into an "Independent Carrier Agreement" with the Tribune. The agreement provided in part:

WHEREAS, the Company is the publisher of the Fremont Tribune, and the Carrier desires to engage in the independant [sic] business of purchasing the Company's newspapers and selling and distributing same, the parties therefore mutually agree as follows:

1. The Company agrees to furnish the Carrier with a delivery schedule, and the Carrier agrees to deliver complete newspapers to all points on such schedule.

2. The Company agrees to sell, and the Carrier agrees to purchase sufficient quantities of newspapers to cover the delivery schedule, together with such additional quantities of newspapers as the Carrier may require in conducting his independent business of selling and delivering the Company's newspapers.

3. The Carrier agrees to pay the Company the balance due for all newspapers supplied or delivered to the Carrier by the Eighth day of each billing period (a billing period is four weeks) at the then prevailing wholesale rates for such newspapers. The Company, upon 7 days notice, may change rates in accordance with a general increase or decrease of said wholesale rates.

4. It is understood that the carrier is free to engage in other business activities, but he agrees that the Company's newspapers will be delivered in a timely manner in accordance with said delivery schedule. The Carrier agrees that he will insert no foreign matter into such newspapers without the prior consent of the Company.

5. The Company and the Carrier agree that either party may terminate this Agreement upon twenty–four (24) days written notice, or such shorter time as may be mutually agreed upon.

The Tribune supplies several items to assist the carriers in their route duties: a "Carrier Hand Book," a "Vacation Handbook for Your Substitute," a collections receipt card, and a collection calendar. The collections receipt card is used to keep track of which customers have paid during each collection period. The collection calendar instructs carriers regarding when the collections are to be done, when they are not to be done, and when the carriers' payments to the Tribune are due.

## 2. "CARRIER HAND BOOK"

The "Carrier Hand Book" is a multipage pamphlet which is given to and reviewed in detail with each new carrier by a Tribune district manager prior to the carrier's first delivery. Although the handbook states that the carrier is "not an employee of the Tribune but an Independent Contract Merchant," it lists the following job guidelines:

The Tribune guarantees its customers home delivery of their paper before 5 p.m. on weekdays and 7 a.m. on Saturdays and holidays. If a customer is missed and notifies the Tribune, a call will be made to the carrier to deliver the paper. The newspapers are to be banded and placed on each customer's porch. If a customer has a special place for the paper, the carrier is to deliver the paper to that place every day. The carrier is to deliver the route alone and use plastic bags when it rains.

On Tuesdays, the carriers are required to deliver "shoppers" (advertisements) to nonsubscribers on their routes. The carriers are paid on a piecemeal basis for these deliveries. Occasionally, the carriers are required to place inserts into their papers. Each carrier is instructed regarding what to do when a person

subscribes to the Tribune and when a customer stops the subscription. Upon receiving a "stop notice," the carrier is to find out why the customer has stopped the subscription. The carrier is instructed to stop delivering the papers if the carrier notices papers piling up for more than 3 days. If a carrier is going on vacation, the carrier is instructed to find a friend to take care of the route and to call the office with the substitute's name, address, and phone number so that the Tribune will know who is in charge while the carrier is gone.

The carriers are instructed on how to collect. They are told to always look their best, be neat and clean, and greet customers with a smile. When approaching a customer, the carriers are to introduce themselves and explain that they are from the Tribune. Suggestions are given for collecting as follows: Never collect without your book or bag, have a regular collection schedule, never take friends, call customers by name, have pocket money to make change, thank customers when they pay, go straight home when finished collecting, never carry large amounts of money, and never collect while delivering. The carriers may start collecting at the beginning of each pay period and are given a collection calendar which shows when to collect and when to pay their bills. The carriers are instructed to always collect at the proper time, arrange their collection cards in the order of delivery, and have one collection card for every household to which they deliver.

Items purchased by a carrier through the office are charged to the carrier's next pay period bill. The carrier may order supplies by phone, and the Tribune places the needed supplies on the bundle the next day. Supplies available include rubberbands, plastic bags, carrier bags, collection cards, introduction pads, and collection pads. The carrier is offered an accident insurance policy, which if purchased is billed on the next statement. Every carrier is required to maintain a savings account balance to cover bills owed to the Tribune. The total balance of the savings account is returned to the carrier with interest when the carrier gives up the route and all bills are paid in full.

Bonuses are offered for each new customer, and the carriers are encouraged to deliver free newspapers to potential customers

on the route and to show promotional fliers to prospects. Carriers are instructed on sales tips, are encouraged to obtain new customers for the Tribune, and are awarded cash and prizes for doing so.

### 3. "VACATION HANDBOOK FOR YOUR SUBSTITUTE"

The Tribune provides each carrier with a "Vacation Handbook for Your Substitute," which instructs substitute carriers on the basics of newspaper delivery. The handbook states: "Any time while you're on vacation it is very important that a well trained substitute properly manages your route." Each carrier is instructed to review the entire vacation handbook with his or her substitute step by step and to follow a checklist which includes the following steps:

(1) Let your District Advisor or the Circulation Dept. know when you will be on vacation and who your substitute will be.

(2) Supply him with 2 neat, accurate and up-to-date route lists and mail a third route list to your District Advisor.

(3) Request and use the vacation time forms. . . . Collect and pay your bill in advance.

(4) Don't leave your sub out on a limb! Explain where to pick up papers and the following:

**A.** Route Number

**B.** Draw (Amount of papers)

**C.** Inserts

(5) **MAIL**

— Explain the following:

**A.** Starts and Stops

**B.** Delivery Errors — Misses and Memos

**C.** Vacation Paks

Instruct him to read and save all the mail for you till you return.

(6) Explain how to report starts and stops every day. Go over sample on Page 6.

(7) How to report shortages immediately.

(8) He should understand that good delivery service is insurance against loss in profits for you.

**(9) DON'T GET HUNG UP:**

Review every phase of this booklet with your substitute so he understands what he is expected to do.

Take him with you at least 3 days while you're delivering your route.

Make sure your sub's parents know he will be subbing for you and for how long.

### 4. BRAUNER'S AGREEMENT WITH LARSON

Brauner was having trouble completing her route in a timely manner on Tuesdays and Wednesdays because of Girl Scout and church activities, and was tired of having sole responsibility for the route. She and Larson discussed dividing the delivery schedule, and the girls' mothers worked out a schedule in which each girl would deliver half of the route on Tuesdays and Wednesdays, and each would deliver the entire route on the remaining days every other week. Brauner retained the duty of collecting each month and retained the rights to the savings account that was automatically withheld out of the girls' earnings at a rate of $10 per month by the Tribune as a deposit against future indebtedness which the Tribune carriers might incur. The girls divided the profits evenly.

Larson did not sign a carrier agreement with the Tribune, but on August 27, 1990, the Tribune was notified by letter of the girls' delivery arrangement. The girls delivered a flier to the Tribune and to each customer on the route explaining the new delivery arrangement. The Tribune did not object to Larson's participation in the route, and Brauner's mother testified that Kathy Brown, a district manager for the Tribune, once asked how dividing the route between the two girls was working out.

On February 22, 1991, Larson was struck by an automobile while delivering Tribune newspapers on her bicycle. She sustained traumatic brain injuries and is now in a persistent vegetative state. Demand was made upon the Tribune for workers' compensation insurance coverage. The Tribune denied coverage on the basis that Larson was an independent contractor, not an employee.

David Larson brought this action to recover workers' compensation benefits as Larson's father and next friend. The

trial to a single judge of the Workers' Compensation Court was bifurcated in order to first determine whether Larson was an employee of the Tribune and, if the defendants were liable, her average weekly wage. The trial judge found that Larson was an employee of the Tribune and was thereby entitled to workers' compensation coverage. The final award was entered on June 28, 1993. The workers' compensation review panel reversed the award, finding as a matter of law that the trial judge erred in determining that Brauner and Larson were employees of the Tribune, and the petition was dismissed. Larson appealed to the Court of Appeals, which reversed the judgment of the review panel and reinstated the trial judge's award. The defendants have petitioned for further review of the Court of Appeals' decision.

## IV. ASSIGNMENTS OF ERROR

The defendants assign the following errors in their petition for further review: The Court of Appeals erred (1) in failing to follow *Anthony v. Pre-Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991), *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984), and *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979); (2) in reversing the workers' compensation review panel, which had found as a matter of law that Larson was acting as an independent contractor, when the findings of the review panel have the force and effect of a jury verdict under § 48–185; (3) by adopting a "substitute employee doctrine" when *Stephens* dictates that the use of a substitute is indicative of independent contractor status and by ignoring the statutory requirement that a worker seeking workers' compensation benefits be acting under "a contract for hire" at the time of injury; and (4) by concluding that the conduct of the parties was inconsistent with the contract terms designating the carriers to be independent contractors.

## V. ANALYSIS

### 1. SCOPE OF REVIEW

We first address the scope of review following a decision by a single judge of the Workers' Compensation Court. Section 48–185 provides in part:

> The judgment made by the compensation court after

review shall have the same force and effect as a jury verdict in a civil case. A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers, (2) the judgment, order, or award was procured by fraud, (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award, or (4) the findings of fact by the compensation court do not support the order or award.

Section 48–179 provides:

No new evidence may be introduced at such review hearing. The review panel may write an opinion, but need not do so, and may make its decision by a brief summary order. The compensation court may reverse or modify the findings, order, award, or judgment of the original hearing only on the grounds that the judge was clearly wrong on the evidence or the decision was contrary to law.

We must determine which judgment is entitled to the force and effect of a jury verdict, that of the trial judge or that of the three–judge review panel. The defendants contend that the findings of the review panel have the force and effect of a jury verdict. We disagree. We conclude that "the single judge of the compensation court is the factfinding trial court and the review panel is performing the first level of appellate review." See *Pearson v. Lincoln Telephone Co.*, 2 Neb. App. 703, 712, 513 N.W.2d 361, 367 (1994).

In the case at bar, we review the findings of fact by the trial judge relating to certain factors which the court used to determine whether Brauner was an independent contractor or an employee. The findings of fact made by the judge in the original workers' compensation hearing have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 530 N.W.2d 916 (1995). Appellate review is controlled by §§ 48–179 and 48–185. Under § 48–179, the workers' compensation review panel may reverse or modify the findings, order, award, or judgment of the original hearing only on the grounds that the judge was clearly wrong on the evidence or the decision was contrary to law.

Under § 48–185, a judgment, order, or award may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.

We adopt the Court of Appeals' reasoning in *Larson v. Hometown Communications, Inc.*, 3 Neb. App. 367, 526 N.W.2d 691 (1995), that the review panel is limited to reversing or modifying only on the grounds set forth in § 48–179. Further appellate review is based upon the grounds set forth in § 48–185. Therefore, we review the findings of the trial court in this case to determine whether there is sufficient competent evidence in the record to warrant the making of the award and whether the findings of fact by the compensation court support the award. See § 48–185(3) and (4).

If there is sufficient competent evidence to support the findings of fact, the appellate court then determines whether such findings of fact support the judgment or award made by the trial court. In *Hemmerling v. Happy Cab Co., supra*, we stated that ordinarily the parties' status as an employee or an independent contractor is a question of fact. "However, where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law." *Id*. at 925, 530 N.W.2d at 920.

### 2. EMPLOYEE OR INDEPENDENT CONTRACTOR: 10–FACTOR ANALYSIS

In determining whether or not a worker is an employee, as distinguished from an independent contractor, there is no single test by which the determination may be made. Such a determination must be made from all the facts in the case. *Anthony v. Pre–Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991). In *Erspamer Advertising Co. v. Dept. of Labor*, 214 Neb. 68, 333 N.W.2d 646 (1983), we cited the Restatement (Second) of Agency § 220 (1958), which lists 10 factors to be considered in determining whether a person is an employee or

an independent contractor. We stated that the common–law test for independent contractors included many factors which were to be considered and weighed in making the determination, no one of which may be conclusive. Subsequently, in *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984), we applied these 10 factors to reach a legal conclusion that the party was an independent contractor rather than an agent. In *Delicious Foods Co. v. Millard Warehouse*, 244 Neb. 449, 507 N.W.2d 631 (1993), we set forth the factors and stated that although control or right of control is the chief factor, no one factor is conclusive.

In the instant case, the review panel found that the trial judge incorrectly applied the facts to show control by the Tribune and found that "the facts applied by the trial [c]ourt to the alleged employment factors in the Restatement go only to assuring an ultimate result and did not subject the plaintiff to the will or control of the defendant to bring about an employee–employer status." The review panel found as a matter of law that Brauner and Larson were at most independent contractors. The review panel found no employer–employee relationship between Brauner and Larson because there was no evidence of a contract of employment or hire.

In testing the sufficiency of the evidence to support the findings of fact, the evidence must be considered in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Wiese v. Becton–Dickinson Co.*, 239 Neb. 1033, 480 N.W.2d 156 (1992). The 10 factors which are considered in determining whether a person is an employee or an independent contractor are:

"(1) the extent of control which, by the agreement, the employer may exercise over the details of the work, (2) whether the one employed is engaged in a distinct occupation or business, (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision, (4) the skill required in the particular

occupation, (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work, (6) the length of time for which the one employed is engaged, (7) the method of payment, whether by the time or by the job, (8) whether the work is part of the regular business of the employer, (9) whether the parties believe they are creating an agency relationship, and (10) whether the employer is or is not in business."

*Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 929, 530 N.W.2d 916, 922 (1995).

### (a) Control

In *Eden v. Spaulding*, 218 Neb. at 804, 359 N.W.2d at 762, quoting *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983), we stated: " 'Generally, control, or the right of control, is the chief criterion in determining whether someone acts as an independent contractor.' " "However, even the employer of an independent contractor may, without changing the status, exercise such control as is necessary to assure performance of the contract in accordance with its terms." *Stephens v. Celeryvale Transport, Inc.*, 205 Neb. 12, 20, 286 N.W.2d 420, 425 (1979).

Although the carrier handbook referred to the carriers as "Independent Contract Merchants" and the Tribune maintained that the carriers were merely subscribers of the newspaper, it was undisputed that the Tribune maintained control of the routes, the delivery times, and the cost of the paper to the carriers and the customers. The carriers were required to place advertising inserts in the newspapers before delivery and to deliver the newspapers wherever the customers wanted them placed. The Tribune accepted complaints and gave directions to the carriers on complaint forms. The carriers were told when to collect.

The district managers reviewed the handbook with new carriers prior to their first deliveries. The handbook contained numerous instructions regarding the manner of performance of a carrier's work. The carriers were instructed how to bundle the papers, to deliver their routes alone, to never collect without the

carrier's book, to never take friends, to have money for change, and to never collect while delivering. The carriers were given guidelines regarding substitute carriers. The carriers were instructed to take their substitute on the route for at least 3 days and to review with the substitute step–by–step guidelines provided in the handbook.

The Tribune argued that any control it exercised was necessary to assure performance of the contract in accordance with its terms. The Tribune maintained that the carriers are the subscribers of the newspaper and that as independent contractors, the carriers sell the papers to the customers on the routes assigned to them.

As to Brauner and Larson, the trial judge found that the Tribune retained and, in fact, exercised control in every important respect. Giving the benefit of all reasonable inferences to Larson, we find there is sufficient competent evidence to sustain the trial judge's finding that the Tribune exercised control of its carriers in a manner that was greater than necessary to merely assure the delivery of newspapers to the customers.

### (b) Distinct Business

The next factor is whether Brauner was engaged in a distinct business and whether she offered a similar service for other businesses or persons. It was undisputed that both Brauner and Larson were not engaged in any business operation other than their duties as carriers of the Tribune. The trial judge found that Brauner and Larson had no other sources of income. The Tribune conceded that carriers were an integral part of its system of delivering newspapers. The trial judge found that the carriers were employed to further the newspaper business, not to perform some function in which the carrier was a specialist. There is sufficient competent evidence to support this finding.

### (c) Whether in Locality, Work Is Ordinarily Done Under Direction of Employer, or by Specialist Without Supervision

The Tribune contended that it did not exert a large amount of supervision over the carriers. District manager Brown testified that the only thing she demanded was that the carriers deliver the papers and pay their bills on time. Virginia Dunlap, the

district manager who had originally signed Brauner, stated that as a general matter, she did not monitor the carriers' routes. If the papers were delivered on time and the bill was paid on time, she had very little contact with the carriers.

The inference from such managers' testimony is that the lack of supervision was not a formal characteristic of the newspaper–carrier relationship, but was rather a function of the quality of the carrier. Dunlap stated: "The better [the] carrier, the less contact you normally had with them. The more problems you had, obviously, the more contact you had with them." The Tribune had a formal structure of managers and district "advisors," whose primary responsibility was to supervise the carriers. The carriers received notice whenever there were complaints from the customers about the carriers' performance. Brown stated she would contact the carrier when a customer filed a complaint with the newspaper.

The district sales manager for out–of–town routes supervised over 70 paper carriers. Clarice Waite, a Tribune manager, testified that if a carrier mistakenly skipped a customer, the district advisor would call the carrier and instruct the carrier to deliver the paper that evening. If a customer had a complaint, the manager would fill out a complaint form and would contact the carrier regarding how to satisfy the customer. The trial judge found that the carriers were under the comprehensive supervision of the Tribune. We find there was sufficient competent evidence to support the trial judge's determination of this factor.

### (d) Skill Required by Occupation

The less skill required by a job, the greater the indication that the worker is an employee and not an independent contractor. See *Employers Ins. of Wausau v. Greater Omaha Trans. Co.*, 208 Neb. 276, 303 N.W.2d 282 (1981). The trial judge found there was no skill required to be a newspaper carrier and noted that the Tribune's carrier advertisement characterized the job requirements as follows: "HEY KIDS! . . . If you're 10 years or older . . . WE NEED YOU!!" The trial judge's finding on this factor is supported by sufficient competent evidence.

### (e) Whether Worker or Employer Supplies Instrumentalities, Tools, and Place of Work for Work to Be Performed

The Tribune initially supplied the carriers' routes, assigned customers to the routes on an ongoing basis, and supplied most of the basic tools that the carrier used. Included among the tools were collection books, collection cards, and vacation handbooks for substitute carriers. Rubberbands and other items were also furnished to the carrier at cost. In addition, the Tribune supplied the carriers with inserts and "shoppers." The Tribune paid the carrier for such delivery. Between 25 and 53 percent of the customers paid the Tribune directly, and the Tribune did not charge the carriers for this collection. The trial judge found that the Tribune supplied the workplace, the instrumentalities, and the tools to carry out the job of being a carrier. There is sufficient competent evidence to support the trial judge's finding.

### (f) Length of Time for Which Person Is Engaged

Although the "Independent Carrier Agreement" stated that the agreement could be terminated by either party upon 24 days' notice, in practice, the Tribune terminated carriers without the specified notice. Such termination was based on the unsatisfactory delivery of papers by a carrier. The trial judge found that because Larson was employed to carry newspapers on a continuous basis, not for a particular terminable job, this factor weighed in Larson's favor. We find there was sufficient competent evidence to support the trial judge's determination.

### (g) Method of Payment: by Time or by Job

The trial judge found that the paper carriers were compensated in part by retaining the difference between the price at which the papers were charged to the carriers and the fixed price paid by the subscribers. The Tribune set the price to the carrier and effectively controlled the subscription price. The carriers were paid 5 cents per piece—a "shopper carrier credit"—for the advertising inserts that the carriers were required to deliver. The trial judge found that Brauner and Larson were essentially paid on a piece rate measured by the difference between the prices of each paper delivered and by the piece rates paid for delivery of the "shoppers." Relying upon

*Riggins v. Lincoln Tent & Awning Co.*, 143 Neb. 893, 896, 11 N.W.2d 810, 812 (1943), the trial judge concluded that "payment of wages on a piece or quantity basis is not inconsistent with the status of an employee." The trial judge's finding is supported by sufficient competent evidence.

### (h) Whether or Not Work Is Regular Part of Business of Employer

It was undisputed that the carriers' delivery of newspapers to customers was a significant part of the Tribune's business. The Tribune regarded carrier deliveries as being made by the Tribune itself. An ad published by the Tribune on August 23, 1990, stated:

> Thank You To Our Subscribers[.] We Delivered 283,452 Newspapers During July, 1990. We Received 246 Service Errors[.] Thank you for subscribing, and a special "Thank You" for calling when you were unsatisfied with our service. We're glad that you want us in your home. To Subscribe, or if your service is unsatisfactory, give us a call . . . .

James Holland, the Tribune's publisher, stated that the carriers were an integral part of the Tribune's business. Sixty-four percent of the Tribune's papers were delivered by carriers such as Larson and Brauner. The carrier handbook instructs the carriers to announce at collection that they are "from the Fremont Tribune." There was sufficient competent evidence to support the trial judge's finding that the delivery of the newspapers was a part of the regular business of the Tribune.

### (i) Whether or Not Parties Believe They Are Creating Relation of Master and Servant

This factor was disputed at trial. The Tribune submitted evidence to show that it was the newspaper industry's standard to consider newspaper carriers to be independent contractors. The contract between the Tribune and Brauner characterized Brauner as an independent carrier.

Brauner testified that she thought of herself as an employee of the Tribune. Brauner felt that if she received a complaint from the Tribune, she had better fix the problem. She felt that

if she did not deliver the route according to the expectations set forth in the carrier handbook, she would be fired or have the route taken away.

Whether an agency exists depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties to characterize or describe their relationship. *Delicious Foods Co. v. Millard Warehouse*, 244 Neb. 449, 507 N.W.2d 631 (1993); *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990). In *Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 927, 530 N.W.2d 916, 921 (1995), we stated: " 'If there exists a written contract [that labels the worker as an independent contractor], it must, of course, be considered and may be of prime importance. . . . However, a writing which merely denominates the relationship may not be used to conceal the true arrangement.' " The trial judge found: "It is beyond sophistry and closer to outright dishonesty to characterize a 10–year[-]old party to a contract as a 'little merchant' and thus an independent contractor." We find that the words used in the "Independent Carrier Agreement" to characterize the relationship did not control the determination of whether the carriers were independent contractors. There was sufficient competent evidence to support the trial judge's determination that the contract terms did not control the issue of whether the carriers were independent contractors.

(j) Whether Employer Is or Is Not in Business

The evidence clearly indicates the Tribune was in business. Also, the trial judge correctly pointed out that failure to withhold taxes from the carriers did not indicate either employee or independent contractor status. State and federal laws exempt the normal withholding of income and Social Security taxes from the earnings of newspaper carriers under the age of 18. See, I.R.C. §§ 3401(a)(10) and 3121(b)(14) (1988); Neb. Rev. Stat. § 77–2753 (Cum. Supp. 1994).

3. Previous Holdings

We next examine our decisions in *Anthony v. Pre–Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991), *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984), and *Stephens v.*

*Celeryvale Transport, Inc.*, 205 Neb. 12, 286 N.W.2d 420 (1979), and consider the Tribune's assertion that the Court of Appeals failed to follow these cases.

Pre–Fab Transit Company (Pre–Fab) was a national trucking concern which received orders from customers to transport goods and then assigned these orders to truckers with whom Pre–Fab had contracted for transportation. Anthony owned his truck and trailer. The contract under which the parties operated provided: " 'It is the intention of the parties to this contract that Contractor shall be and remain an independent Contractor . . . .' " *Anthony v. Pre–Fab Transit Co.*, 239 Neb. at 405, 476 N.W.2d at 561. Anthony was required to use his own equipment in performing the contract. His compensation was 75 percent of the revenue received by Pre–Fab on each haul he made. He was paid only for hauling the loads, not while driving an empty truck. On his income tax forms, Anthony indicated he was self–employed; he paid his own taxes; and he took his own business deductions. Anthony was required to insure against liability arising from the use of his equipment. He had the right to hire employees, but the contract specifically provided that any such employees would be his. Pre–Fab did not have authority over the selection of Anthony's routes or the determination of whether Anthony would accept a particular assignment. Based upon these and other facts, we found nothing in the manner of performance that was inconsistent with the independent contractor relationship described in the contract.

In *Eden*, the plaintiff sought to recover damages for injuries received when his car collided with a truck driven by defendant Spaulding and owned by defendant Fundum. Spaulding was on his way to pick up newspapers in Omaha and transport the newspapers to Norfolk. We expressly pointed out that " 'the common–law test for independent contractor includes many factors which are to be considered and weighed in making the determination, no one of which may be conclusive.' " *Eden v. Spaulding*, 218 Neb. at 804, 359 N.W.2d at 761 (quoting *Erspamer Advertising Co. v. Dept. of Labor*, 214 Neb. 68, 333 N.W.2d 646 (1983)). Applying the 10 factors from the Restatement (Second) of Agency § 220 (1958) to the facts in *Eden*, we found as a matter of law that Fundum was an

independent contractor. The control exercisable by the newspaper was minimal. It could only suggest when Fundum should pick up the newspapers. The newspaper had no control over the drivers of the trucks and did not dictate the truck route, and there were no intimations in the record which suggested a right of control on the part of the newspaper. At the time, Fundum also had other contracts with the post office, and he did not rely solely on the newspaper for income.

Clearly, Fundum was engaged in a distinct trucking operation. Hauling for the newspaper was not his only business. The job was not supervised by the newspaper, and there were no fixed routes or regulations regarding carrying passengers or other baggage. Fundum supplied all his own equipment, and on the night of the accident, he paid for a substitute truck to haul the newspapers. Fundum had his own employees, and the paper made no deductions for Social Security or withholdings for income tax from the payments made to Fundum.

In *Stephens*, we determined as a matter of law that Stephens was an independent contractor. There was a clear inference that a master–servant relationship did not exist. The manner in which the agreement between the parties was carried out was not in any way inconsistent with Stephens' status as an independent contractor under the terms of the agreement.

A determination regarding whether a worker is an employee, as distinguished from an independent contractor, must be made from all the facts in the case. *Anthony v. Pre–Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991). In the case at bar, the trial judge's findings have established the existence of 10 factors that create the inference of an employer–employee relationship. Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id. Anthony*, *Eden*, and *Stephens* are factually dissimilar to the present case, and they do not control our decision. The trial judge's factual determination regarding the 10 factors and the inferences therefrom is supported by sufficient competent evidence and is not clearly wrong.

## 4. LACK OF CONTRACT

In the case at bar, the remaining issue is whether Larson can

be an employee of the Tribune without formally contracting with the Tribune. The letter and flier stated that Brauner would be sharing her route with Larson and set forth the delivery schedule. The trial judge determined that Larson was a substitute employee of Brauner who therefore became an employee under the Workers' Compensation Act because the Tribune knew of and acquiesced in Larson's working as a substitute. The trial judge found that the Tribune had actual knowledge that Larson was assisting Brauner on a regular basis with Brauner's paper route and that the Tribune encouraged its carriers to engage substitutes to help with their routes and provided handbooks to the carriers for use in training substitutes.

Brauner testified that the Tribune had notified her of a few customer complaints about Larson. Brauner's mother testified that she had had a conversation with district manager Brown, in which Brown had inquired as to how the sharing of the route with Larson was going. The girls continued this arrangement for almost 6 months, and the Tribune never objected to this arrangement.

In addition, the Tribune encouraged carriers to find and train substitutes to help the carriers complete their routes, and the Tribune maintained a list of substitutes who were available to assist the carriers in their deliveries. The carrier handbook encouraged each carrier to seek out someone who could fill in as a substitute when the carrier was on vacation or if the carrier could not deliver the papers for another reason. The "Vacation Handbook for Your Substitute" instructed substitute carriers on the basics of newspaper delivery and stated: "Any time while you're on vacation it is very important that a well trained substitute properly manages your route."

Brown testified that in her initial meeting with each new carrier, she discussed the substitute process. Brown instructed the carriers to inform the Tribune who the substitute would be so she could contact the substitute if a problem arose. Encouraging the use of substitutes was important to the district managers because if for some reason the papers were not delivered, the district managers would be required to deliver the papers themselves.

The review panel, while noting that the trial judge made a finding of fact that the Tribune had actual knowledge that Larson was assisting Brauner in her paper route, concluded that the Tribune had knowledge only that an independent contractor may have had someone helping to deliver the papers and that Brauner and Larson were at most independent contractors. The review panel concluded there existed no contract of employment or hire between the defendants and Larson. We disagree with that conclusion.

Neb. Rev. Stat. § 48–115(2) (Reissue 1988) provides:

> Every person in the service of an employer who is engaged in any trade, occupation, business, or profession as described in section 48–106 under any contract of hire, expressed or implied, oral or written, including aliens and also including minors, who for the purpose of making election of remedies under the Nebraska Workers' Compensation Act shall have the same power of contracting and electing as adult employees.

This section recognizes that a contract for hire may be expressed or implied, including a contract with minors. "A person working as a substitute for another may be an employee under a workmen's compensation act, at least where the employer knows of, and acquiesces in, the substitution . . . ." 99 C.J.S. *Workmen's Compensation* § 74 at 298 (1958).

In *Bobik v. Indus. Comm.*, 146 Ohio St. 187, 64 N.E.2d 829 (1946), the Ohio Supreme Court recognized that it was a well–settled rule of law that if a master expressly or impliedly assents to an arrangement whereby a person is procured by an employee to act as his substitute, the substitute occupies the position of an employee of the master. In *Veit v. Courier Post Newspaper*, 154 N.J. Super. 572, 382 A.2d 62 (1977), the court held that where the newspaper clothed the newsboy with authority to engage a substitute, which occurred routinely in the course of its business, and had at least implied notice of the substitution, an implied contract of employment arose between the substitute and the newspaper for purposes of workers' compensation.

We apply the reasoning of the Ohio and New Jersey courts to the case at bar. The trial judge found that the Tribune was

advised of the fact that Brauner would be sharing her route with Larson. This relationship continued without objection for almost 6 months. The Tribune expressly granted its carriers the authority to engage substitutes, which occurred routinely in the course of its business. Therefore, under the facts of this case, Larson occupied the same position with the Tribune as did Brauner. We find that an implied agreement existed between the Tribune and Larson and that Larson would have the same status with regard to the delivery of newspapers for the Tribune as did Brauner.

## VI. CONCLUSION

We conclude that the findings of fact as to the existence of the 10 factors and the inferences from such factors establish as a matter of law that an employer–employee relationship existed between the Tribune, as employer, and Brauner and Larson, as employees. Under the facts of this case, Larson is covered under the Nebraska Workers' Compensation Act. The judgment of the Court of Appeals, reinstating the award of the trial judge, is affirmed.

On March 17, 1995, the Court of Appeals awarded $15,000 to the plaintiff as attorney fees pursuant to Neb. Rev. Stat. § 48–125 (Reissue 1993). We granted further review pending our decision in the above matter. The order regarding attorney fees is affirmed.

AFFIRMED.

WHITE, C.J., and LANPHIER, J., not participating.