MARVIN HALE, APPELLEE, V.
VICKERS, INC., APPELLANT.
635 N.W.2d 458

Filed November 13, 2001. No. A-01-326.

Paul F. Prentiss and Paul E. Larson, of Timmermier, Gross & Prentiss, for appellant.

Dirk V. Block, of Marks, Clare & Richards, for appellee.

HANNON, SIEVERS, and MOORE, Judges.

SIEVERS, Judge.

Vickers, Inc., appeals from the Nebraska Workers' Compensation Court's award to Vickers' employee Marvin Hale. At issue is whether Hale unreasonably refused to submit to an examination by Vickers' physician, thereby creating a reasonable controversy about the compensability of Hale's claim, and whether the trial court adhered to the fee schedule of the Workers' Compensation Court in awarding Hale medical expenses.

## FACTUAL BACKGROUND

Hale has a history of knee problems. Hale testified before the Workers' Compensation Court trial judge that in the late 1970's, his right knee often locked up due to loose cartilage. In 1978 or 1979, Hale became unable to work, so he underwent knee surgery. Hale testified that following this surgery, he did not seek any additional treatment to his right knee, that the surgery did not limit his activities, and that he never missed any work due to knee problems until the instant situation.

On July 11, 1999, while working for Vickers as a machine operator, Hale stepped off of the platform on which he worked, wedging his right foot between the platform and the floor. He twisted his right knee as he fell. Hale told his employer immediately that he had been hurt but continued his shift that day. When he got home, Hale made an appointment with Dr. Samar Ray, who saw him on July 16, 1999. Dr. Ray wrote the following in his progress note of that date:

> Marvin says on 07/12/99 he fell at work and twisted his right knee and since then, he has had considerable discomfort in the knee. The knee is also swollen. He said he can hardly walk on this knee. In the past, he had an open meniscectomy of the right knee, might be about 20-25 years

ago. He said he never really had any problem with the right knee until he fell.

Dr. Ray also noted that x rays of the knee showed moderately advanced degenerative arthritis. He gave Hale a cortisone injection and a program of physical therapy. Hale continued to work, but with substantial difficulties. On July 30, 1999, Hale reported to Dr. Ray that he was better than before, but still felt numbness while driving and a tightness in his knee. Dr. Ray prescribed anti-inflammatory medication and advised Hale to continue with the physical therapy.

On August 6, 1999, Hale reported to Dr. Ray that he "really [was] not making any progress," "continue[d] to have significant pain," could not "do many of the activities he would like to do," and was "having problems sleeping at night." Dr. Ray noted in his progress report that the cortisone injection had provided Hale some relief, but that Hale felt ready to proceed with total knee arthroplasty. Hale ceased work at this time, as Dr. Ray advised Hale not to work until after the surgery.

According to Hale, his condition continued to worsen from the day of the accident up to the date of surgery, which Dr. Ray had scheduled for August 25, 1999. Dr. Ray first mentions the surgery in his progress note of August 6, although the note does not specify a date for the procedure. Vickers' labor relations manager testified that Vickers did not learn of the proposed surgery until August 18, when its industrial nurse received a copy of Dr. Ray's progress note of August 6.

Soon after receiving notice of the scheduled surgery, Katie Eilers, a Vickers claim representative, telephoned Hale to request that he submit to an examination by a doctor of Vickers' choice. Hale agreed, and Eilers told him that Vickers had scheduled an August 30, 1999, appointment for Hale to be seen by Dr. Michael Morrison. Hale said that he could not keep that appointment because of his surgery on August 25, and Eilers told him to postpone the surgery. Hale testified that he told her "[n]o, I'm in too much pain. I can't sleep. I'm eating . . . Advil by the bottles. I'm not postponing my surgery." Eilers sent Hale a letter on August 20, confirming the appointment as follows: "As per our telephone conversation, an appointment has been made for you with Dr. Michael Morrison on August 30, 1999 at 3:15 P.M. . . . As we

discussed, when the type of surgery that is involved is this extensive, it is important to have a second opinion."

Hale underwent surgery as scheduled and therefore did not attend the August 30, 1999, appointment with Dr. Morrison. On October 21, Eilers wrote Hale a letter denying his workers' compensation claim. The letter explains the denial as follows:

> It is our position that your refusal to attend this examination prior to surgery substantially prejudiced our rights to investigate the extent your injury affected your preexisting degenerative knee condition.
>
> For this reason, we assume your surgery is related solely to your preexisting degenerative knee condition, and are thus denying the expenses for surgery and your claim for benefits due to time missed from work as unrelated to your alleged work injury.

After Hale filed this action for benefits, Vickers hired Dr. Peter Cimino to examine Hale's knee, and Hale saw Dr. Cimino as Vickers requested. Dr. Cimino's August 17, 2000, report indicates that Hale's accident at work "led to acute onset of severe knee pain." Further, Dr. Cimino noted:

> He went to therapy without relief. I believe he did try an injection. His unrelenting pain eventually led to a total knee replacement by Dr. Ray in August of 1999. The surgery has proved very helpful for his pain relief. He was returned back to work in December of 1999 with a 25 pound lifting restriction. I believe he has been back to work ever since.

Dr. Cimino also noted Hale's "significant" history for knee problems and stated that "[h]e did have some aching discomfort intermittently but never severe until the work accident." Finally, Dr. Cimino acknowledged that "[t]he claim is complicated by the fact that there was a pre-existing condition. The work injury exasperated [sic] this condition, thus leading to the knee replacement procedure." Dr. Cimino found that "the procedure was a success and Mr. Hale will be able to continue with very little restrictions."

Dr. Ray rendered an opinion that a right total knee replacement was required as a result of the aggravating injury and that Hale had "sustained a permanent partial disability of thirty-seven percent (37%) of the right lower extremity." In his letter to Vickers' attorney, Dr. Cimino generally agreed with this

assessment: "It does appear that the knee replacement procedure was excelerated [sic] by the work aggravation on July 11, 1999. I am in agreement with the permanent assessment of 30 percent to the right lower extremity as a result of the knee replacement."

## PROCEDURAL BACKGROUND

Hale filed a petition for hearing with the Nebraska Workers' Compensation Court on September 27, 1999. The trial judge found that Hale's compensable accident at work aggravated his preexisting degenerative arthritis and that Hale had sustained a "37 percent permanent partial disability to his right leg." The trial judge also found that Hale did not refuse to submit to an examination and that no reasonable controversy existed with respect to the compensability of Hale's claim. Accordingly, the judge ordered that Hale be paid disability of $468 per week for a period of 16⁵⁄₇ weeks for temporary total disability and, thereafter, $468 per week for 79½ weeks for a 37-percent permanent partial disability to the right leg. Hale was also awarded a 50-percent penalty of all unpaid and due disability payments, attorney fees of $2,792, and hospital and medical expenses totaling $32,882.47.

Vickers appealed to the compensation court's review panel, which affirmed in all respects, and now Vickers appeals to this court.

## ASSIGNMENTS OF ERROR

■ Vickers assigns as error that the trial judge and the review panel erred in awarding Hale benefits when Hale refused to postpone elective surgery to allow an examination by Vickers' physician. Vickers' brief does not argue this assignment, and in order to be considered by an appellate court, an assignment of error must be both specifically assigned and argued as error in the appellant's brief. See *Nelson v. Lusterstone Surfacing Co.,* 258 Neb. 678, 605 N.W.2d 136 (2000). Thus, the compensability of the claim is not at issue in this appeal.

The two assignments of error which are both assigned and argued, and which we decide, are the Workers' Compensation Court's (1) awarding Hale waiting-time penalties and attorney fees after finding that no reasonable controversy existed to justify Vickers' denial of benefits and (2) failing to direct that medical

expenses should be paid pursuant to the fee schedule as required by Neb. Rev. Stat. § 48-120 (Cum. Supp. 2000).

## STANDARD OF REVIEW

In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of fact of the single judge who conducted the original hearing. *Guico v. Excel Corp.*, 260 Neb. 712, 619 N.W.2d 470 (2000). As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given testimony. *Hernandez v. Hawkins Constr. Co.*, 240 Neb. 129, 480 N.W.2d 424 (1992). In testing the sufficiency of the evidence to support the findings of fact, the evidence must be considered in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Larson v. Hometown Communications, Inc.*, 248 Neb. 942, 540 N.W.2d 339 (1995).

Findings of fact by the Workers' Compensation Court trial judge are not to be disturbed on appeal unless clearly wrong. *Owen v. American Hydraulics*, 254 Neb. 685, 578 N.W.2d 57 (1998). An appellate court may not substitute its view of the facts for that of the Workers' Compensation Court if the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court. *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996).

## ANALYSIS

*Reasonable Controversy About Facts or Applicable Law.*

Vickers claims that the trial judge erred in finding that no reasonable controversy existed to justify Vickers' denial of benefits and that thus waiting-time penalties and attorney fees should not have been awarded. Neb. Rev. Stat. § 48-125 (Cum. Supp. 2000) authorizes a penalty of 50 percent of compensation payable where there is no reasonable controversy regarding an employee's claim for workers' compensation and payment is delinquent for 30 days. *Hobza v. Seedorff Masonry, Inc.*, 259 Neb. 671, 611 N.W.2d 828 (2000). Whether a reasonable controversy exists

under § 48-125 is a question of fact. *Hobza, supra.* As said in *Hollandsworth v. Nebraska Partners*, 260 Neb. 756, 619 N.W.2d 579 (2000), the penalty statute is to encourage prompt payment of benefits. In summary, the mandate for prompt payment of benefits requires that employees and insurers promptly handle and decide claims. If they do not, and there is no reasonable controversy about compensability, then penalties will be assessed.

A reasonable controversy may exist (1) if there is a question of law previously unanswered by the appellate courts, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the Nebraska Workers' Compensation Court concerning an aspect of an employee's claim for workers' compensation, which conclusions affect allowance or rejection of an employee's claim, in whole or in part. *Guico, supra.* To avoid the penalty provided for in § 48-125, an employer need not prevail in the employee's claim, but must have an actual basis in law or fact for disputing the claim and refusing compensation. *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987).

Whether an injury is caused by a work-related accident is a question of fact. *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990). Vickers argues that the accident might not have caused the disability necessitating surgery: "Dr. Ray testified that Hale suffered from degenerative arthritis due to knee surgery in 1979," and "Dr. Ray stated the cause of the degenerative arthritis was due to the 1979 surgical removal of cartilage in Hale's knee." Brief for appellant at 15. This evidence, according to Vickers, "strongly suggests that Hale's total knee replacement surgery related solely to his preexisting degenerative condition; thus, there is a basis for finding a reasonable controversy." *Id.*

It has long been recognized that the lighting up or acceleration of preexisting conditions by accident is compensable. *Riggs v. Gooch Milling & Elevator Co.*, 173 Neb. 70, 112 N.W.2d 531 (1961). Because aggravating injuries have long been compensable, no reasonable controversy of a legal nature was presented because Hale had a knee operation in 1979 or because he had preexisting degenerative arthritis in the knee.

As far as a factual controversy is concerned, Vickers produced no evidence which even hinted that the July 11, 1999, incident did not occur as Hale said it did. That leaves only medical evidence for Vickers to point to as showing that the July 11 incident was not a cause of the surgery and resulting disability. However, there simply is no such medical evidence or even any dispute between the two physicians involved. Dr. Ray said, and Dr. Cimino agreed, that Hale's injury occurred at work, that the incident aggravated a preexisting medical condition so that surgery was necessary, and that temporary and permanent disability resulted. There was a complete absence of evidence that Hale's injury was not compensable, and no "reasonable but opposite conclusions" could have been reached by the trial judge regarding the compensability of Hale's claim, given the clear and unanimous nature of the medical evidence. See *Guico v. Excel Corp.*, 260 Neb. 712, 619 N.W.2d 470 (2000).

*Reasonable Controversy: Was Examination by Vickers' Physician Refused?*

Neb. Rev. Stat. § 48-134 (Reissue 1998) provides that if the employer so requests, an employee seeking benefits under the Nebraska Workers' Compensation Act shall submit to an examination by a physician or surgeon furnished by the employer. As we understand it, Vickers' position is that while it does not seek a ruling from us that no benefits were payable because of Hale's alleged unreasonable refusal to be examined, it does advance the proposition that Hale's action created a reasonable controversy over compensability which excludes the award of penalties. Under the plain language of § 48-134, one purpose of the statute is to allow an employer to gather medical evidence to analyze, and perhaps dispute, all or part of a claim. This would include gathering evidence as to whether a proposed course of medical treatment is necessitated by a compensable work accident. But, it is crucial to note that the statute does not allow a complete denial of benefits, even if there is an unreasonable refusal to be examined, because the employer's sole remedy under the statute is that the employee is deprived of compensation "during the continuance of such refusal." § 48-134. Thus, Vickers' suggestion that an unreasonable refusal

to be examined justifies a complete denial of benefits is untenable and contrary to the clear language of the statute, unless of course, the refusal continued during the entire time when benefits were payable. We hold that the fundamental question of the compensability of a employee's claim stands separate from whether the employee can be deprived of benefits under § 48-134 during the time of an unreasonable refusal to undergo an employer's medical examination.

The trial judge saw the issue a bit differently. He framed this issue as whether Vickers could "dictate that an injured worker can only get treatment after the examination of [sic] Section 48-134," and the judge answered in the negative. This is fundamentally correct, but begs the question because an employee can get any treatment he or she desires—the issue is really whether the employer will pay for the treatment. If there has been a compensable injury, if the treatment is necessary, and if the cost is fair and reasonable, then the employer is liable for the expense. See, § 48-120; *Hare v. Watts Trucking Service*, 220 Neb. 403, 370 N.W.2d 143 (1985) (employer is liable for those reasonable medical expenses incurred as result of compensable accident). However, the fact that the trial judge may not have precisely framed the issue is of little consequence.

Vickers argues that it was unable to acquire medical evidence to defend the claim because Hale refused to postpone his surgery to be examined. Vickers introduced evidence that it received notice of Hale's surgery just 1 week before it was scheduled and argues that the earliest appointment date available for Hale's examination was 12 days later on August 30, 1999. According to Vickers, "providing Vickers only one week's notice before an elective surgery for a total knee replacement and then refusing to postpone the surgery to accommodate a reasonable request for a second opinion evaluation is tantamount to an unreasonable refusal . . . and justifies Vickers' denial of benefits." Brief for appellant at 12. While Vickers' answer did not plead the alleged refusal as either a complete defense or as the basis of a reasonable controversy, the parties clearly tried this issue and the trial judge decided it. Therefore, we conclude that Hale has waived any claim that the defense was not properly raised by Vickers.

 Whether an employee's refusal to submit to a § 48-134 medical examination was unreasonable is a fact question. *Behrens v. American Stores Packing Co.*, 234 Neb. 25, 449 N.W.2d 197 (1989). The trial judge found that Hale "never refused to submit to an examination." According to the judge, Hale "testified, and [Vickers] does not dispute, that [Hale] was willing to be examined by a physician of [Vickers'] choice." The judge also noted that Dr. Cimino's report shows that Hale did indeed submit, though after his surgery, to an examination by a physician of Vickers' choice on August 16, 2000.

There is no evidence that Hale ever told Vickers' representative, Eilers, that he would not undergo an examination. Rather, the evidence is that he refused to postpone his surgery on August 25, 1999, in order to be examined by Dr. Morrison on August 30. But Vickers did not reschedule the examination to an earlier date, nor did it introduce any evidence showing that it could not reschedule the examination before Hale's surgery. Evidence on either point would greatly assist Vickers' claim that Hale's action amounts to a refusal, but there was no such evidence. Accordingly, the trial judge's conclusion that there was not a refusal to undergo an examination is not clearly wrong, and we do not disturb that finding.

*Failure to Postpone Surgery: Prejudicial to Vickers?*

 Vickers next argues that Hale's failure to postpone his surgery prejudiced Vickers' ability to determine whether the surgery was necessary or caused by a work-related injury which in turn created a reasonable controversy over payment of benefits. As a matter of law, and as we have already held, this argument is fundamentally unsound because § 48-134 does not allow for a complete denial of benefits, even if there is a refusal to be examined. As a matter of evidence, this "prejudice argument" also fails because Vickers introduced no evidence showing that because Hale proceeded with the surgery, Dr. Morrison (or any other physician who could have been hired by Vickers) was prevented from assessing Hale's knee and rendering opinions on causation and the necessity of surgery. Absent such evidence, Vickers' claim of "prejudice" is pure speculation. Whether proceeding with surgery impacted any physician's ability to assess causation and necessity of the surgery requires expert testimony when the

patient's condition is a subjective injury rather than an objective injury. See *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999) (holding that where character of injury is subjective rather that objective, cause and extent of injury must be established by expert medical testimony). There is no evidentiary support for Vickers' claim of prejudice; thus, the claim must fail, even if we were to conclude that a failure to postpone surgery was the equivalent of a refusal to be examined, a matter we need not reach because the predicate evidence is not in the record. A reasonable controversy cannot be created by mere speculation, nor by an employer's claim, unsupported by evidence, that the employer's potential defenses were prejudiced because the employee had surgery before an examination by the employer's physician. In reaching this conclusion, we obviously are mindful of the frequency that expert medical opinions are rendered merely on the basis of examination of the medical records, x rays, and other test results.

*Variance in Disability Ratings as Reasonable Controversy.*

Vickers claims that Dr. Ray's assessment of permanent impairment is the basis for a finding that there was a reasonable controversy because his assessment of permanent impairment is fraught with inconsistencies. Dr. Ray's deposition was taken July 10, 2000, and he testified that in his opinion, Hale had suffered some permanent impairment because he only had movement of the knee from 0 to 120 degrees, whereas normal full movement would be to 140 to 150 degrees. He said that as a result, Hale had "sustained some permanent partial disability to that knee." We quote the exchange which directly followed:

Q: Have you ascribed that a percentage rating at this time?

A: No, because we would have to go to the AMA book to find out exactly how much, 10 to 15 percent, I believe.

Q: Doctor, if I request that in writing, will you provide that to me?

A: Yes.

Q: But, in any event, it's your opinion based on a reasonable degree of medical probability that he does have permanent impairment?

A: Yes.

Thereafter, in response to a letter of July 11, 2000, from Hale's counsel, Dr. Ray wrote a letter of July 28, in evidence as exhibit 2, in which he said:

> In going through the *AMA Guides to the Evaluation of Permanent Impairment, 4th edition*, I think, although he had a good result following his total knee replacement, as he had to have a total knee replacement, he has sustained a permanent partial disability of thirty-seven percent (37%) of the right lower extremity, which comes to fifteen percent (15%) of the whole person.

Vickers had Hale seen by Dr. Cimino, whose letter of August 17 was received in evidence as a late-filed trial exhibit. Dr. Cimino stated: "I am in agreement with the permanent assessment of 30 percent to the right lower extremity as a result of the knee replacement." It is probably a reasonable inference that Dr. Cimino meant to agree with the 37-percent impairment assessed by Dr. Ray—since no doctor assessed the impairment at 30 percent. The trial judge found that the permanent impairment was 37 percent.

We first note that the fact that a portion of the disability may be in dispute does not allow the employer to withhold payment of all disability. In short, the employer must pay, within 30 days of accrual, the payments which are undisputed.

> [W]here the total amount of compensation due for permanent disability is in dispute, the employer has a duty under the provisions of § 48-125(1) to pay within 30 days of the notice of disability any undisputed compensation; the only legitimate excuse for delay in the payment is the existence of a genuine dispute from a medical or legal standpoint that *any* liability exists.

(Emphasis supplied.) *Grammer v. Endicott Clay Products*, 252 Neb. 315, 320, 562 N.W.2d 332, 335 (1997). *Musil v. J.A. Baldwin Manuf. Co.*, 233 Neb. 901, 905, 448 N.W.2d 591, 594 (1989), establishes the rule that an employer is responsible for paying benefits when the presence of disability itself is undisputed:

> Although there is a controversy in regard to the nature and extent of the plaintiff's permanent disability, there is no evidence to support a contention that the plaintiff has no

> permanent disability. To avoid the payments assessable under § 48-125, an employer need not prevail in opposition to an employee's claim for compensation, but must have an actual basis, in law or fact, for disputing the employee's claim and refraining from payment of compensation. *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987).

Applying these principles, we note that there is no evidence that from August 6, 1999, until his release to return to work on November 30, Hale was not totally disabled by an aggravating injury which occurred at work. Thus, all temporary total disability had accrued, was unpaid, and was subject to penalty when the case was tried on August 8, 2000.

As far as permanent impairment of the leg is concerned, the only real factual dispute in the record is that Dr. Ray assessed it at 37 percent of the leg and Dr. Cimino said it was 30 percent. We cannot agree that by itself, the deposition of Dr. Ray creates a reasonable controversy because he plainly says that there is impairment, but he has not yet consulted the *"AMA Guides to the Evaluation of Permanent Impairment, 4th edition."* Once he did so, he put the impairment at 37 percent—a figure that Vickers' own doctor does not dispute—or if he does, only the difference between 30 percent and 37 percent. Hence, there was no controversy as to whether Vickers owed Hale for at least a 30-percent impairment of the leg, or 64½ weeks at his compensation rate of $468 per week. But, we note that as of trial, no compensation whatsoever had been paid, and that at oral argument, both counsel agreed that such remained true.

However, the trial judge did not specify the precise amount of the penalty, saying only that it applied to the "due and owing" disability payments. While the precise amount of the penalty should be specified, a remand is not feasible here as the trial judge is no longer on the bench. Therefore, we modify the award so that it is appropriately specific about the penalty. There are $16^5/_7$ weeks of temporary total disability and 64½ weeks of permanent partial disability about which there is no reasonable controversy, which has not been paid, and which became 30 days' delinquent on April 1, 2001.

■ The pendency of this appeal does not prevent the assessment of the penalty, nor does it relieve Vickers of timely paying the weeks of temporary and permanent disability over which there was no controversy. See *Roth v. Sarpy Cty. Highway Dept.*, 253 Neb. 703, 572 N.W.2d 786 (1998) (if employer does not have actual basis, in law or fact, for disputing employee's claims and thus is not justified in appealing award, employer is not excused from paying benefits within 30 days of award, notwithstanding that appeal to review panel was filed). The statutory penalty is $19,004.15 (16⅚ weeks temporary total disability + 64½ weeks permanent partial disability = 81.2143 weeks × $468 × 50 percent). Vickers shall also pay the attorney fees ordered by the trial judge, those ordered by the review panel, and those which we will award after compliance with Neb. Ct. R. of Prac. 9F (rev. 2000).

*Workers' Compensation Court's Fee Schedule.*

Vickers cites a portion of § 48-120, which provides that "the provider or supplier of [medical] services shall not collect . . . from any employer . . . any amount in excess of the maximum fee established by the compensation court for any such service." Vickers assigns error because the trial judge's award of benefits was allegedly not in accordance with the fee schedule. Vickers states that "the compensation court is statutorily obligated to ensure that medical providers not receive any amount in excess of the maximum fee established by the compensation court." Brief for appellant at 17-18.

■ We need not reach the merits of Vickers' argument, because in addition to voicing no objection at the trial to Hale's offer of the evidence of his medical expenses, Vickers introduced no evidence of its own that the expenses claimed by Hale and awarded by the compensation court were unreasonable, unnecessary, or outside the fee schedule contemplated by § 48-120. When the employee presents evidence of medical expenses resulting from injury, it has made out a prima facie case of fairness and reasonableness, causing the burden to shift to the employer to adduce evidence that the expenses are not fair and reasonable. *Bituminous Casualty Corp. v. Deyle*, 234 Neb. 537, 451 N.W.2d 910 (1990). Having not contested the fairness and reasonableness of the medical expenses at trial, Vickers

cannot do so at the appellate level. This assignment of error is without merit.

## CONCLUSION

The trial court was not clearly wrong in finding that Hale did not refuse to submit to the examination Vickers requested pursuant to § 48-134 and that no reasonable controversy existed about the compensability of Hale's claim. Vickers' claim of prejudice by Hale's actions is rejected as being completely without any evidentiary basis, dispensing with any need for us to analyze whether that claim has any legal merit. We have no evidence that the trial court failed to award expenses in accordance with the compensation court's fee schedule. For those reasons, we affirm the compensation court's order and award in every respect, except as to the foregoing modification to specify the amount of the penalty.

AFFIRMED AS MODIFIED.