IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

MACIAS V. BADER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LOUIS MACIAS, APPELLANT,
V.
GARY BADER, APPELLEE.

Filed December 30, 2014.    No. A-14-107.

Appeal from the District Court for Merrick County: MICHAEL J. OWENS, Judge. Affirmed.

Vincent M. Powers for appellant.

Tanya J. Hansen, of Leininger, Smith, Johnson, Baack, Placzek & Allen, for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

Louis Macias was riding his motorcycle on a highway in Worms, Nebraska, when he collided with a horse owned by Gary Bader. Macias was thrown from his motorcycle and sustained an injury to his left shoulder. Macias brought an action for negligence against Bader for failing to secure the horse's enclosure, and following a jury trial, the jury found that Macias incurred a total of $10,693.20 in damages for medical expenses and property damage, but no general damages, as a result of Bader's negligence. The jury reduced Macias' damages by 49 percent, for his own contributory negligence for failing to keep a proper lookout, and awarded him a total of $5,453.53. The trial court later entered a judgment reducing Macias' award to $3,570.71, due to a portion of Macias' medical expenses being discharged in bankruptcy. Macias now appeals, arguing that the jury should not have been instructed on contributory negligence and that the jury's award was inadequate. We affirm.

BACKGROUND

At the time of the accident, Macias was a member of a group called ABATE, a social organization for motorcyclists. In June 2009, Lonnie McIntosh, the road captain of ABATE,

decided to organize a poker run charity event. On June 13, McIntosh invited Macias to do a pre-poker run to check the highways that would be traveled during the poker run and inform different establishments about the poker run. McIntosh began the pre-poker run in Grand Island, Nebraska, around 4:30 p.m. with Dan and Heather Knudsen, and Macias joined at a later stop in St. Paul, Nebraska. Each of the establishments visited by the riders on the pre-poker run were bars.

After a few stops, McIntosh decided the group should head to Worms because it was getting late. The group was traveling between 50 to 60 m.p.h. (testimony varied within this range) in a staggered formation on Worms Road, with McIntosh as the road captain in front on the centerline, followed by Macias, who was followed by Heather, with Dan in the rear. Dan testified there was approximately 15 to 20 feet between each rider. McIntosh testified the group usually rides in a staggered formation when it starts getting dark, and at the time, it was dusk. While traveling on Worms Road, McIntosh saw "something brown" in the ditch that "was coming at them." McIntosh initially thought it was a deer, but realized as it came out of the ditch it was a horse. McIntosh observed that the horse looked like it was going to "come right at [him]," so he sped up a little bit, and that the horse "shot right behind [him]." McIntosh testified he could not remember if he signaled.

Macias testified he saw McIntosh swerve and point to the ditch, and Macias also pointed to the ditch for Dan and Heather. Macias testified he saw animals, which he initially thought were deer, so he started moving to the centerline and "tried to downshift gears to slow down." Macias continued, "All of a sudden, the animal shot in behind [McIntosh] and I had nowhere to go." Macias testified he impacted the horse going about 55 to 60 m.p.h. and was separated from his motorcycle. McIntosh did not see the impact between the horse and Macias, but when he looked in his mirror, he saw a motorcycle sliding on its side down the centerline. Dan and Heather testified they did not see Macias take evasive action or the collision itself. McIntosh testified he did not notice that there were multiple horses on the side of the road until after the accident, and both Dan and Heather testified they saw no horses until after the collision. The collision happened sometime between 9 and 9:30 p.m., at which point it was dusk, but still light.

After the collision, the group stopped and observed that Macias was lying motionless in the road. McIntosh testified that Dan called the 911 emergency dispatch service because Macias was unconscious and not responsive, although Dan testified he did not know who called 911. After about 5 minutes, Macias began to move and said, "I got to go home." Macias then got on his motorcycle and rode home. McIntosh and Dan observed that Macias could not move his left arm, as he had to use his right arm to lift the left arm onto the handlebars. McIntosh testified that he stayed behind and had a conversation with the paramedics when they arrived. McIntosh testified he told the paramedics that Macias had "come to and got on his bike and left." McIntosh testified no deputy sheriff arrived at the scene. Heather testified that after Macias left, she and Dan left the scene and went to a place named "Nightcrawlers."

According to the testimony of Bader, as he headed back to the road after putting the injured horse away, he heard sirens and saw "[b]oth men jump[] up" (one of which included Macias) and leave. At trial, Bader did not recall seeing a woman at the scene. Bader's wife, Connie Bader, testified that she drove up to the scene and that McIntosh started yelling at her through her car window. Connie testified McIntosh smelled "like whiskey and booze." Connie

testified that when she heard sirens, "[McIntosh] immediately left, and so did the man on the motorcycle . . . The man on the pavement by the motorcycle also got up and left." According to Connie, a deputy sheriff did arrive, but she did not speak to him and left.

Macias testified that he does not remember anything after he saw the horse "come out" of the ditch until he was sitting in his garage on his motorcycle. Macias first sought treatment at the hospital the next afternoon because he could not move his left arm. At some point after that, Macias went to a chiropractor, who referred Macias to Dr. Benjamin Gelber, a neurosurgeon. Dr. Gelber first treated Macias on July 13, 2009 (1 month after the accident). Macias reported to Dr. Gelber that he had weakness and numbness in his left arm and hand after hitting a horse and being thrown from his motorcycle. Dr. Gelber diagnosed Macias' injury as a "brachial plexus stretch injury" and opined that Macias' motorcycle accident was the proximate cause of the injury. Dr. Gelber testified there was not a specific treatment for Macias' injury, and he recommended Macias undergo EMG and nerve conduction studies (which confirmed Macias sustained an injury to his left brachial plexus). Dr. Gelber's only other recommendation was for Macias to engage in physical therapy two times a week for 1 to 2 weeks. Macias reported that he went to physical therapy for two visits and then stopped.

Macias next visited Dr. Gelber's office on January 11, 2010. Dr. Gelber testified that Macias was "much improved" and that his deltoid muscle had improved to the point where he could lift it against gravity. Dr. Gelber recommended that a physical therapist begin Macias on a home exercise program. Dr. Gelber next saw Macias on April 10, at which point Dr. Gelber stated Macias' arm appeared normal, although Macias was still complaining of arm pain and numbness. On April 19, Dr. Gelber requested a followup on the EMG and nerve studies. On January 21, 2011, Macias underwent EMG testing, which showed evidence of "reinnervation," which Dr. Gelber testified meant the nerves were healing. Macias was still complaining of left arm weakness on that date, but reported he was able to go back to work at that time.

Dr. Gelber's last visit with Macias was April 12, 2012. Macias still complained of sensory loss on the left side and thought his arm was weak. Dr. Gelber noted "subtle weakness in the left bicep" but also stated that Macias was "[q]uite strong in the left arm overall." As of that date, Dr. Gelber believed Macias had reached maximum medical improvement.

At trial, Macias testified that his arm has improved quite a bit and that he was employed as a welder in Grand Island. Macias testified there was a significant difference in what he could lift with his right arm versus his left. A functional capacity assessment performed by a physical therapist, Kyle McCallum, on June 26, 2012, reflected that Macias had significant limitations with his left upper extremity compared to his right. At the time of his assessment, McCallum was not aware that Macias had sustained a radial head fracture of his left elbow on September 30, 2010, although McCallum testified it would not change the way he performed the assessment.

Macias filed a complaint on February 9, 2012, and an amended complaint on July 5, alleging that Bader and his wife, Connie, were the owners of a horse that escaped from an enclosure on his property, that they were negligent in failing to secure the enclosure, and that as a result of their negligence, Macias suffered damages to his motorcycle, injuries to his left shoulder, a loss of income, and past, present, and future disability, inconvenience, and pain. The Baders filed an answer on July 25 denying that they were negligent and alleging that Macias' damages (if any) were caused by his own contributory negligence.

A jury trial was held on August 22 and 23, 2013. McIntosh, Macias, and the Baders testified, and the depositions of Dan, Heather, Dr. Gelber, and McCallum were read aloud to the jury. At the close of the evidence, Connie was dismissed as a party. Macias moved that the court find as a matter of law that there was no contributory negligence based on the evidence at trial; this request was overruled. Over Macias' objection, the jury was instructed on contributory negligence regarding failure to maintain a proper lookout.

The jury returned a verdict on August 23, 2013, finding that Macias' total damages were $10,693.20, which included $9,693.20 in medical expenses and $1,000 in property damage. The jury awarded Macias $0 in "General Damages." Because the jury found that Macias was 49 percent contributorily negligent, they reduced his award to $5,453.53.

Macias initially filed a notice of appeal to this court on August 28, 2013, but a journal entry by the district court indicates this appeal was subsequently dismissed. Macias filed a motion for new trial on September 6, on the basis that there was no evidence to support giving the contributory negligence instruction. The trial court entered an order on October 24, 2013, scheduling a hearing on Macias' motion for new trial and on the issue of Macias' bankruptcy proceeding, and a hearing was held on January 14, 2014. The court received evidence that $3,691.80 of Macias' medical expenses were discharged in bankruptcy. The court entered a judgment on January 24, reducing Macias' award to $3,570.71. The court also overruled Macias' motion for new trial on January 24.

Macias timely filed a notice of appeal from the trial court's January 24, 2014, judgment.

ASSIGNMENTS OF ERROR

Macias assigns as error on appeal that (1) the district court erred in submitting the issue of comparative negligence to the jury and (2) the jury verdict was inadequate as a matter of law because it failed to award damages for pain, suffering, inconvenience, or other general damages.

STANDARD OF REVIEW

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Warner v. Simmons*, 288 Neb. 472, 849 N.W.2d 475 (2014).

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010). An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011).

ANALYSIS

*Contributory Negligence Jury Instruction.*

Macias assigns that the court erred in submitting the issue of contributory negligence to the jury, permitting it to consider whether he breached his duty to keep a proper lookout. Macias argues that although he saw the horse in the ditch, there was no way he could anticipate the

direction the horse would take, and that all the witnesses present testified there was nothing Macias could have done to avoid hitting the horse.

Contributory negligence is conduct for which a plaintiff is responsible, amounting to a breach of the duty which the law imposes upon persons to protect themselves from injury and which, concurring and cooperating with actionable negligence on the part of the defendant, contributes to the injury. *Corcoran v. Lovercheck*, 256 Neb. 936, 594 N.W.2d 615 (1999). Negligence is defined as doing something that a reasonably careful person would not do under similar circumstances, or failing to do something that a reasonably careful person would do under similar circumstances. *Kappenman v. Heule*, 241 Neb. 54, 486 N.W.2d 27 (1992). In determining the question of whether the evidence is sufficient to submit the issues of negligence and contributory negligence to the jury, a party is entitled to have all conflicts in the evidence resolved in his favor and the benefit of every reasonable inference that may be deduced from the evidence, and if reasonable minds might draw different conclusions from a set of facts thus resolved in favor of a party, the issues of negligence and contributory negligence are for a jury. *Stauffer v. School Dist. of Tecumseh*, 238 Neb. 594, 473 N.W.2d 392 (1991). Negligence is a question of fact and may be proved by circumstantial evidence and physical facts. *Id.* Where there is a reasonable dispute as to what the physical facts show, the conclusions to be drawn therefrom are for the jury. *Id.* The credibility of witnesses and the weight to be given their testimony are solely for the consideration of the jury. *Id.*

The allegation of contributory negligence at issue was for Macias' failure to keep a proper lookout. A motorist has the duty to look both to the right and to the left and to maintain a proper lookout for the motorist's safety and that of others. *Springer v. Bohling*, 263 Neb. 802, 643 N.W.2d 386 (2002). The Nebraska Supreme Court has previously explained what is meant by a driver's duty to keep a proper lookout:

> "'[T]he driver of an automobile is legally and mandatorily obligated to keep such a lookout that he can see what is plainly visible before him and to operate his automobile in such a manner that he can stop it and avoid a collision with any object in front of him.'"

*Id.* at 808, 643 N.W.2d at 393 (quoting *Vilas v. Steavenson*, 242 Neb. 801, 496 N.W.2d 543 (1993). A driver must keep a lookout ahead or in the direction of travel, and he is bound to take notice of the road, to observe the conditions along the way, and to know what is in front of him for a reasonable distance. *Mantz v. Continental Western Ins. Co.*, 228 Neb. 447, 422 N.W.2d 797 (1988).

The collision in the instant case took place in the summertime between 9 and 9:30 p.m.; the evidence reflected that although it was dusk, it was still light out. At the time, the grass was green, the horse was brown, and the road was straight and flat. McIntosh and Macias both testified they saw animals in the ditch on the side of the road prior to the collision. The evidence reflects that the horses were plainly visible, imposing on Macias a duty to operate his motorcycle in a manner such that he could avoid a collision. See *Springer v. Bohling, supra*. Although Macias testified he took some evasive action after seeing the horses by moving to the centerline and slowing down, he nevertheless impacted the horse going about 55 to 60 m.p.h. Macias testified he drank no alcohol that day, and McIntosh, Dan, and Heather testified that they did not see Macias drink alcohol that day; however, Bader's counsel impeached Macias with his

deposition testimony that he bought a beer at one of their stops, but did not drink the whole thing "because it just didn't taste right." Given the testimony that the riders visited several bars on the pre-poker run prior to the collision, the Baders' testimony that Macias and the others left the scene as soon as they heard sirens, and Connie's testimony that McIntosh smelled "like whiskey and booze," reasonable minds could draw different conclusions as to the sufficiency of Macias' lookout. See *Stauffer v. School Dist. of Tecumseh*, 238 Neb. 594, 473 N.W.2d 392 (1991). Where different minds may reasonably draw different conclusions or inferences from the evidence adduced concerning the issues of negligence or contributory negligence and the degree thereof when one is compared with the other, such issues must be submitted to the jury. *Sullivan v. Geo. A. Hormel and Co.*, 208 Neb. 262, 303 N.W.2d 476 (1981). We conclude that the evidence was sufficient to submit the issue of contributory negligence to the jury.

*Inadequate Damages.*

Macias argues that the jury verdict was inadequate because it did not award him any damages for pain, suffering, or other general damages.

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010). An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011).

The parties stipulated that Macias incurred $9,693.20 in medical bills, which the jury awarded Macias. The jury also awarded Macias $1,000 for property damage to his motorcycle. The jury was instructed that it could consider compensating Macias for "[t]he physical pain and mental suffering [Macias] has experienced and is reasonably certain to experience in the future" and "[t]he reasonable monetary value of the inconvenience [Macias] has experienced and is reasonably certain to experience in the future" as a proximate cause of Bader's negligence. The jury, however, awarded Macias nothing for general damages. The evidence reflects that although Dan called 911 after the accident, Macias did not wait for medical attention and instead drove his motorcycle home. Macias did not go to the hospital until the next afternoon. Macias' injury was diagnosed as a "brachial plexus stretch injury," which Dr. Gelber testified requires no specific treatment besides physical therapy. Macias only went to two physical therapy visits. Dr. Gelber's notes from a visit approximately 7 months after the accident noted that Macias was "much improved." Dr. Gelber stated Macias' arm appeared normal as of April 2010, although Macias was still complaining of arm pain and numbness. Dr. Gelber's last visit with Macias was April 12, 2012, at which point Dr. Gelber believed Macias had reached maximum medical improvement. As of trial, Macias testified his arm has improved quite a bit and he was employed as a welder in Grand Island. Although Macias testified he still experienced weakness in his arm, and the functional capacity evaluation reflected the same, given the nature of Macias' injury and the fact that he did not immediately seek medical care, the jury could reasonably have concluded that Macias experienced no pain and suffering, or if he did, that it was de minimis. See *Hunter v. Sorensen*, 201 Neb. 153, 266 N.W.2d 529 (1978). The jury's award for Macias' medical

- 6 -

expenses and property damage, but no damages for his pain or suffering, bears a reasonable relationship to the evidence at trial, and we cannot say that the jury's award was so inadequate as to be the result of passion, prejudice, or mistake.

CONCLUSION

For the foregoing reasons, we find no error in submitting the issue of contributory negligence to the jury and affirm the judgment of the trial court upon the verdict of the jury.

AFFIRMED.